(No. 67395.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ROMNEY ADAMS, Appellee.

*Opinion filed October 25, 1989.*

Neil F. Hartigan, Attorney General, of Springfield, and Edward F. Masters, State's Attorney, of Joliet (Robert J. Ruiz, Solicitor General, Terence M. Madsen and Arleen C. Anderson, Assistant Attorneys General, of Chicago, and Kenneth R. Boyle, John X. Breslin and Judith Z. Kelly, of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Stephen Omolecki, Assistant Defender, of the Office of the State

Appellate Defender, of Ottawa, for appellee.

JUSTICE CLARK delivered the opinion of the court:

At issue in this appeal brought by the State is the threshold necessary to support a finding of probable cause sufficient for a warrantless arrest and subsequent search and seizure. Appellee, Romney Adams, was charged by indictment with delivery of a controlled substance in that he possessed and intended to deliver more than 30 grams of cocaine (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(a)(2)); armed violence in that he committed the felony of possession of a controlled substance while armed with a .38-caliber revolver (Ill. Rev. Stat. 1985, ch. 38, par. 33A—2; ch. 56½, par. 1402(b)); and unlawful use of a firearm by a felon in that he knowingly possessed on or about his person a .38-caliber revolver having previously been convicted of a felony (Ill. Rev. Stat. 1985, ch. 38, par. 24—1.1(a)).

Prior to trial, Adams filed a motion to suppress, alleging that there was no probable cause to support the police stop of his automobile and the subsequent search of his vehicle. The trial court, following a hearing, denied the motion to suppress. A jury trial was held in the circuit court of Will County; Adams was found guilty of the three charges. He was sentenced to concurrent terms of 14, 10, and 4 years' imprisonment.

Adams appealed and his conviction was reversed. (169 Ill. App. 3d 284.) Though he raised four separate issues before the appellate court, that court addressed only one of the issues and reversed based on a finding that there was no probable cause for the arrest and search. (169 Ill. App. 3d at 285.) We allowed the State's petition for leave to appeal pursuant to our Supreme Court Rules 315(a) and 612(b) (107 Ill. 2d Rules 315(a), 612(b)). As explained below, we affirm the decision of the appellate court.

The State urges this court to reverse the appellate court based on its contention that the trial court's finding of probable cause sufficient to support the warrantless arrest of Adams and the subsequent search of his vehicle was not manifestly erroneous. Adams contends that the appellate court correctly decided the probable cause issue and, pursuant to our Supreme Court Rule 315(g) (107 Ill. 2d R. 315(g)), raises five additional issues for our review: (1) whether reversible error occurred when the prosecutor was allowed to elicit testimony that Officer Valera, based upon hearsay, had reason to believe Adams was armed where that evidence depicted Adams as a violent criminal and corroborated Cheryl Edwards' suspect testimony that Adams gave the gun to her shortly before the arrest; (2) whether the trial court deprived the defendant of a fair trial and violated his constitutional right of confrontation by unduly restricting defense counsel's cross-examination of prosecution witness Cheryl Edwards; (3) whether Adams was denied a fair jury determination of his innocence or guilt where the prosecutor improperly suggested to the jury that Adams had threatened witness Cheryl Edwards; (4) whether Adams was denied a fair trial by the improper comments of the prosecutor during closing arguments; and (5) whether Adams' three convictions violate the "one act—one crime" principle.

Following a statement of the pertinent facts, we will discuss and rule on a motion to strike filed by Adams and then address the probable cause, arrest and subsequent search issue. Our disposition of this single issue makes it unnecessary to address the additional issues raised by Adams in his cross-appeal.

On October 7, 1986, Adams and a passenger, Cheryl Edwards, were driving westbound on Interstate 80, near Interstate 57, in Will County when Adams noticed six police cars, three on each side of the westbound lanes of

Interstate 80. As he drove past the police vehicles, Adams noticed that the vehicles entered the traffic lanes behind him and blocked all other traffic from behind. Shortly thereafter Adams passed a weigh station where he noticed that about 10 police vehicles were lined up; as Adams passed the weigh station, the vehicles proceeded out of the station and followed him. Shortly after he passed the crest of a hill, Adams noted that the interstate highway ahead of him was completely blocked off by police vehicles. Adams came to a stop, he testified, about 10 to 15 feet from the parked police vehicles blocking the two-lane highway. By this time police vehicles had come up on each side of his car; he was thus completely surrounded by police vehicles with all other traffic blocked off. Adams estimated that there were about 20 police vehicles in all. Uniformed police officers got out of their cars and came towards the Adams vehicle with guns drawn and pointed at Adams and Edwards, his passenger. The guns, Adams testified, were pointed through the front windshield and down through the open sunroof. Adams also noticed a non-uniformed gentleman—later identified as Officer Phillip Valera—get out of a maroon Cutlass and come towards his car. Adams testified that he had noticed this car following him for the past three hours. As the uniformed officers approached Adams' vehicle, the occupants were told to put their hands on top of their heads and to keep them there. Because the doors of the car were locked, Adams' passenger, Edwards, was instructed to unlock the doors. Police then instructed Cheryl Edwards to get out of the car. An officer immediately took her towards the back of the car and held her there. When Edwards was positioned behind the car, held by an officer, the police instructed Adams to slide across the front seat to the passenger side of the car and exit the car via the passenger door. Adams slowly slid across the bench seat of the car.

There is some discrepancy in the testimony as to exactly what happened next. Adams testified that as he exited the car, Edwards' purse caught on his foot and, as he stood up outside the car, he stood on one foot and had the purse caught on the other while the police were handcuffing him. Officer Valera testified that as Adams exited the car the purse fell out of the car, fell to the ground open, and a gun fell out of the open purse. It was at this point, he testified, that the police grabbed Adams and handcuffed him. A further search of the purse revealed what appeared to be drugs and drug paraphernalia.

Officer Valera, a police officer with the city of Joliet on assignment with the Metropolitan Area Narcotics Squad (MANS), testified during the hearing on the motion to suppress. He testified that on the morning of October 7, 1986, he was conducting surveillance on Interstate 65 in Indiana. MANS agents had positioned themselves on other highways in addition to Interstate 65 looking for a black Chrysler New Yorker with Illinois registration and plates numbered MWN 354. The surveillance was being conducted in response to a tip which Valera had received.

Officer Valera testified that, on the evening of October 6, 1986, sometime after 7 p.m., he received a call from a confidential informant who told him that Romney Adams had left for Kentucky and would be driving back into Will County from Kentucky with some cocaine. The informant also told Valera that Adams would possibly be armed with a handgun. The informant had on an earlier occasion described Adams' automobile and given the license plate number of the car. In addition, the informant had previously told Valera that Adams would be getting the cocaine from a person known as Frank Collins. Valera testified that Collins was a person known by the

MANS agents to be a cocaine distributor in the Joliet area.

Officer Valera contacted the State's Attorney's office in an effort to obtain a search warrant for the Adams vehicle based on the informant's information. However, the warrant was not issued; Valera was told that before a warrant could be issued he would have to corroborate that the vehicle was indeed traveling back from Kentucky. MANS agents therefore stationed themselves on highways in Indiana that might be used by a person returning from Kentucky; when Valera spotted Adams in Indiana on Interstate 65 just south of Gary, he believed that Adams was indeed returning from Kentucky though he was not able to offer any verification of this fact other than Adams' presence on Interstate 65.

The confidential informant had first contacted the police on about September 29, 1986. Officer Valera met with the informant once in order to obtain personal information from him; subsequent contacts were by phone. While the October 6 call was the first information received from this informant that led to an arrest, the informant had given information on another occasion which indicated that Adams would be leaving for Kentucky to obtain some cocaine. On that occasion, Valera set up surveillance of Adams' home. However, Adams never left the house that particular night. The surveillance was ended and the informant subsequently called Valera to inform him that Adams' planned trip had been cancelled. It was during these initial conversations that the informant told Valera that Adams had previously served time in prison; Valera then ran a computer check on Adams to verify the information, and found that Adams had been convicted of voluntary manslaughter which involved a firearm. Additionally, it was during these initial conversations that the confidential inform-

ant was told that if the information he provided led to an arrest that he would be paid for the information.

When Adams' travels on Interstate 80 were halted and he was completely surrounded by the approximately 20 police vehicles with uniformed police approaching his automobile with guns drawn, the police and MANS agents were acting, Valera testified, on the informant's tip. Officer Valera testified that, based on Adams' presence in Indiana on Interstate 65 and his route into Will County, the roadblock had been set up for the purpose of conducting an "investigation." No search or arrest warrant had been issued. Adams was not cited for any traffic violations nor has there been an allegation that his conduct and handling of the automobile would give rise to any such charges.

There is no question that under both the United States and the Illinois Constitutions every person is protected against unreasonable searches and seizures. (See U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6.) Article I, section 6, of the Illinois Constitution provides:

> "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, §6.

We turn first to Adams' motion to strike a portion of the State's reply brief which raises, for the first time, an alternative theory. The State argued in its reply brief that should the court find that there was no probable cause for the stop, then the stop should be considered a valid "*Terry* stop." (See *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) Adams' motion to strike that portion of the brief arguing the alternative

theory, to which the State filed objections, was taken with the case. We grant Adams' motion to strike.

Our review of the record indicates that at no time during the hearing on the motion to suppress or at the trial did the State propose that the police stop of Adams was valid as a *Terry* stop. Indeed, during oral arguments on the motion to suppress, the State could have responded to defense counsel's statements wherein counsel indicated that since the State, in its arguments, had not argued that the stop was a *Terry* stop, but had argued probable cause under *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, and *People v. Tisler* (1984), 103 Ill. 2d 226, defense would limit its arguments to probable cause under those two cases. The State had opportunity to reply after these defense counsel statements and did not raise at that time, even in the alternative, the 'possibility that this was a valid *Terry* stop.

The State may not now, almost as an afterthought, argue that the defendant was stopped under a totally different theory than argued before both the trial court and the appellate court. This court has long held that an issue not raised in the trial court is considered waived. (*People v. O'Neal* (1984), 104 Ill. 2d 399, 407; *People v. Holloway* (1981), 86 Ill. 2d 78, 91.) This principle applies equally to the State and the defendant in a criminal case. (*People v. O'Neal* (1984), 104 Ill. 2d 399, 407; *People v. Knight* (1979), 75 Ill. 2d 291, 299-300.) While the principle is generally applied to alleged errors objected to at the trial level and followed by a motion for a new trial, it is applicable also in the case before us.

*People v. O'Neal* (1984), 104 Ill. 2d 399, is instructive on this point. In *O'Neal*, the State had objected at trial to a certain jury instruction. Before the trial court the State proffered one theory for the objection; however, before this court the State objected to the instruction on

a completely different theory. This court noted in *O'Neal* that " 'specific objections waive all grounds not specified \*\*\*.' [Citation.]" (104 Ill. 2d at 407.) This court then went on to note the important policy considerations of the waiver doctrine, all of which are applicable to the case now before us:

> " '[T]he [waiver] rule is founded on some rather basic considerations, which include the following: that litigation should not be presented piecemeal; and that all parties are entitled to have matters determined as quickly as possible and at one trial, if possible. The latter consideration is particularly true of a defendant in a criminal action.' " *People v. O'Neal* (1984), 104 Ill. 2d 399, 408, quoting *People v. McAdrian* (1972), 52 Ill. 2d 250, 253-54.

In the case before us, the State objected to the defendant's motion to suppress evidence based on a theory of probable cause under *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, and *People v. Tisler* (1984), 103 Ill. 2d 226. We agree with Adams that the State, by failing to argue the theory of a *Terry* stop at trial, has waived any right to have this court consider the *Terry* argument on review.

We turn now to the State's argument that there was sufficient probable cause to support the warrantless arrest of Adams and the subsequent search of his vehicle, a finding made by the trial court but reversed on appeal. Both courts relied on a classification of the "tipper" to support their ultimate finding, the trial court classifying him as a citizen informant and the appellate court classifying him as a paid informant. This difference is not of as great an import as the State argues before this court in urging that the determination of the trial court be reinstated. The central issue is not the rigid classification of the informant as an ordinary citizen or a paid informant but, rather, whether the information, taken in its totality, and interpreted not by technical legal rules but by

factual and practical commonsense considerations, would lead a reasonable and prudent person to believe that the person stopped had committed an offense. (*People v. Tisler* (1984), 103 Ill. 2d 226, 236-37.) Thus it matters not by what name the informant is labelled; we look rather to the informant's reliability as only one of the factors to be considered in the totality of the circumstances approach. *Tisler*, 103 Ill. 2d at 238; see also *Massachusetts v. Upton* (1984), 466 U.S. 727, 80 L. Ed. 2d 721, 104 S. Ct. 2085 (holding that a totality of circumstances standard was proper for determining probable cause for issuance of a search warrant based on information from an informant).

In the past, trial courts' reliance on distinctions between citizen informants and paid informants has provided, in reality, a shortcut to determinations on credibility and reliability. Courts have found a citizen informant credible because historically a citizen informant would have been a victim or a witness to criminal activity. Greater credibility has traditionally been accorded such persons who have been witnesses to criminal activity and who act with the intent to aid the police in law enforcement efforts rather than for any personal gain or payment for the information. (See *Jaben v. United States* (1965), 381 U.S. 214, 14 L. Ed. 2d 345, 85 S. Ct. 1365; *Chambers v. Maroney* (1970), 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975; 1 W. LaFave, Search and Seizure, A Treatise on the Fourth Amendment §3.4(a), at 587 (1978).) Where the informant had been paid, however, courts have looked to whether the informant had in the past established a pattern of having provided reliable information to the police. The rationale for the distinction between citizen and paid informants, and the different indicia of credibility in each case, was to assure that individuals were protected from unreasonable searches and

seizures by demanding that reliable information be provided before a person is stopped or searched.

The rationale of protecting against unreasonable search and seizures by demanding reliable information from informants is still relevant under the totality of the circumstances test adopted by this court in *People v. Tisler* (1984), 103 Ill. 2d 226. Thus, the basis of the informant's knowledge is indeed relevant (*i.e.*, whether it is based on being a victim or witness or whether he is a reliable paid informant); however, the rigidity embodied in the presumptions concerning the classifications is no longer applicable. We agree with the appellate court's statement in *People v. Townsend* (1980), 90 Ill. App. 3d 1089, wherein the court noted "these classifications are in fact terms of art that represent opposing ends on a continuum of reliability." (90 Ill. App. 3d at 1095.) Thus, based on an evaluation of all of the information available, including the source of the information, the question is one of whether there is probable cause to believe that the individual in question is involved in criminality.

This court has clearly stated that "[w]hen a police officer has proceeded without a warrant to search, seize evidence, or arrest a person, the trial court making a probable-cause determination is to apply standards at least as stringent as those that guide a magistrate in deciding whether to issue a warrant. [Citation.]" (*People v. Tisler* (1984), 103 Ill. 2d 226, 236.) This review cannot be tainted by hindsight which may luckily seem to be supported by the fruit of some criminality; rather, the review must center on the information available to the officers preceding the search or arrest. The question is, Would a reasonable person in that officer's position believe that a crime was being or had been committed? *Tisler*, 103 Ill. 2d at 237.

What did Officer Valera and the officers in the approximately 20 police vehicles which stopped Adams

know when Adams' car was surrounded on the interstate highway? Was the information sufficient to allow a reasonable person to believe that Adams was committing or had committed an offense?

As detailed above, Valera received information from an informant who wished his identity to remain confidential. Valera had numerous contacts with the informant, including a face-to-face meeting in which Valera collected personal information about the informant. We know that the informant had never provided information about anyone else to the police before and did not have a police record and that, based on what Valera told him, he expected to be paid for the information. Additionally, the record indicates that several days prior to the date here under review, the informant had indicated that Adams would be traveling to Kentucky, but that the trip did not take place at that time. On October 6, 1986, the informant again called Valera and told him that Adams had left for Kentucky and would be returning to the Joliet area right away with cocaine which Adams would procure from Frank Collins. The informant also told Valera that Adams might have a gun with him. Valera had also been told on a prior occasion the make and license number of the automobile that Adams was driving.

Based on this information and the information that Adams had served time in prison for manslaughter, Valera contacted the State's Attorney's office and attempted to obtain a warrant. Valera was told that before a warrant could be issued, he needed to verify that Adams had indeed traveled to Kentucky.

Under a totality of the circumstances review, verification that Adams had indeed been in Kentucky and had seen Frank Collins would tend to support the informant's other information that Adams had cocaine and a gun in his possession. Because the informant did not indicate that he had personally seen the cocaine delivered

to Adams (a witness to the transaction), nor did he provide information which implicated himself in the wrongdoing (*e.g.*, he was an individual whom Adams supplied), thereby increasing possible reliability, this situation, as the State's Attorney's office correctly perceived, required further verification. Could Adams' presence in Indiana on Interstate 65 serve as corroboration that Adams had indeed been in Kentucky and had seen Frank Collins? Would his presence on Interstate 65 support the conclusion that he had cocaine and a gun in the car?

The question is, Would a reasonable person, seeing Adams and a passenger traveling north on Interstate 65, be able to reasonably conclude that Adams had been in Kentucky? The trial court concluded that because the informant was an ordinary citizen his information was presumptively reliable and that Adams' presence on Interstate 65, a possible return route from Kentucky, supported the information that he possessed cocaine and a gun; the police therefore had probable cause to stop Adams. This court has consistently held that a reviewing court will not disturb a trial court's ruling on a motion to suppress unless it is manifestly erroneous. (*People v. Tisler* (1984), 103 Ill. 2d 226, 248; *People v. Reynolds* (1983), 94 Ill. 2d 160, 165.) If the trial court had a substantial basis for concluding that probable cause existed, the ruling will be undisturbed. *Tisler*, 103 Ill. 2d at 248.

Here, the facts do not support the trial court's determination. To begin, Valera knew that Adams had served time in prison and that he drove a certain type of automobile. Valera had been informed that Adams might be carrying a gun. He had been told that Adams had left for Kentucky. However, the record clearly indicates that Valera had no information as to the exact time of Adams' departure from Illinois nor did he have any information as to exactly where in Kentucky Adams might be meeting Collins. The State of Kentucky covers many

miles. Lacking information as to exactly where in Kentucky Adams was supposed to travel, it would have been impossible to make any reliable estimate of the time which Adams would be expected to return to his home, information which could then be supported by his presence on the highway in Indiana at a certain time. We also note that the police were unsure enough of a return route between Illinois and Kentucky that officers were placed on several highways in Indiana in order to look for Adams. Additionally, we note that the record does not indicate that there was even an independent verification that Collins was in Kentucky, that Collins and Adams knew each other, or that Adams was even known to be involved in drug trafficking. Furthermore, there was also no information which indicated that Adams would not be traveling alone. Adams and Edwards' mere presence on Interstate 65, a major highway connecting with several other major routes to other States, does not create an inference that Adams was in Kentucky. Without more, there simply was no probable cause for the stop. The totality of the circumstances does not support a finding of probable cause. This court's analysis in *Tisler*, the case in which this court adopted the totality of the circumstances test to establish probable cause, supports this conclusion.

Both the State and Adams contend that *People v. Tisler* (1984), 103 Ill. 2d 226, supports their respective positions. The balance, however, tilts more favorably towards Adams in this case. In *Tisler*, the police received information from an informant, one who had consistently supplied accurate information over an extended period of time, that Tisler and Jerry Cox had gone to Streator to pick up LSD; that they would return to Marseilles in Tisler's car at 3:40 p.m.; that they would return via the river bridge; that they would proceed to the Number Nine Game Room where they would deliver the LSD;

and that the LSD would be in a very small container that could be disposed of easily. (103 Ill. 2d at 231-32.) The officer who received the tip knew Tisler and his companion and knew the automobile that Tisler drove. He knew that the Number Nine Game Room was a hangout for local teens, and he knew that the road leading over the river bridge was the shortest, most direct route from Streator to Marseilles. (103 Ill. 2d at 232.) Before Tisler was arrested, the officer verified that Tisler and Cox entered Marseilles at 3:45 p.m. from the direction of the river bridge despite extremely treacherous road conditions due to severe winter weather; that Tisler and Cox were traveling in Tisler's car; that they proceeded to a parking spot across from the Number Nine Game Room; that Tisler held a small plastic bag in his hand as he emerged from the car; and that Tisler attempted to hide the bag as the officer approached him. 103 Ill. 2d at 233-34.

In *Tisler* it is evident that the police had independently corroborated most of the informant's information prior to an arrest of the defendant. The officer did not arrest Tisler until after he had seen the small bag in Tisler's hand and after he asked Tisler what was in his hand. Tisler was not stopped merely because he was on a certain road; he was not even approached until he left his car with evidence of contraband in plain sight. The facts in the case before us do not come close to the specificity that was found acceptable in *Tisler*.

Officer Valera testified that Adams was stopped on the interstate merely as part of an investigation. The facts belie that assertion. At the time that Adams' vehicle was stopped, his automobile was completely surrounded by approximately 20 police vehicles. Officers approached his vehicle with guns drawn and pointed directly at the occupants through the windshield and open sunroof. The occupants were told to put their

hands on their heads, and Adams was told to exit the automobile from the passenger side. All of this occurred *before* Edwards' purse opened to disclose a gun. The appellate court correctly concluded that Adams was indeed under arrest without probable cause from the moment of the stop. 169 Ill. App. 3d at 287.

Adams' motion to suppress should have been allowed and evidence obtained through the search should have been held inadmissible. Because we affirm the appellate court's reversal of the trial court's finding of probable cause, we need not address the remaining issues raised by Adams.

*Judgment affirmed.*