# Illinois Official Reports

## Appellate Court

***People v. Petty*, 2017 IL App (1st) 150641**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD PETTY, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-0641 |
| Filed | May 30, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-06736; the Hon. Luciano Panici, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jessica Ware, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Neville and Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant Ronald Petty was convicted by a jury of retail theft (720 ILCS 5/16A-3(b) (West 2010)) and sentenced to two years' incarceration. Petty argues that the trial court should have granted his motion to quash arrest and suppress uniform product code (UPC) labels seized from his car. We hold that the plain-view doctrine applies and the trial court properly denied his motion. Petty also asserts the prosecutor argued facts not in evidence to the jury in closing; shifted the burden of proof to the defense; and commented on his post-arrest silence, failure to testify, and failure to present evidence in his defense. We find no errors requiring reversal.

¶ 2                                    BACKGROUND
¶ 3                                  I. Pretrial Motions
¶ 4                A. Motion to Quash Arrest and Suppress Evidence
¶ 5    Police seized UPC labels in plain view on the floorboard of Petty's lawfully stopped car. Petty moved to quash his arrest and suppress this evidence. The trial court denied the motion. At the hearing, Officer Bruni testified that on March 22, 2011, he and his partner talked to Nicholas Runkle, the assistant manager at Best Buy, about thefts at area Best Buy stores. Runkle told them Best Buy had issued a storewide alert for an individual placing UPC labels for $42 Sony DVD players on $400 BluRay players and purchasing the more expensive players at the lower price.

¶ 6    According to Bruni, Runkle had discovered that two BluRay players were missing during a routine inventory. After checking purchase receipts, Runkle came across a receipt for the sale of two DVD players on February 17. The name on the receipt was "Ronald Petty." Runkle checked the surveillance video for February 17 and spotted the customer and transaction. Bruni and his partner viewed the videotape. It showed a man with his arm in a sling pushing a cart with two BluRay player boxes to the cashier and checking out. Runkle gave Bruni the receipt and the surveillance video.

¶ 7    Some two hours after Bruni and his partner left, Petty appeared at the store. Runkle called Bruni, and he and his partner returned and waited in the parking lot. Petty left without purchasing anything. Petty matched the physical description provided by Runkle, and Bruni recognized Petty as the same person in the surveillance video. Bruni and his partner saw Petty get into a car and drive away. The officers ran the plates, which identified the car as belonging to Ronald Petty, whose license had been suspended. The officers stopped Petty and arrested him for driving on a suspended license. As Petty was being taken out of his car, Bruni's partner saw some UPC labels on a clipboard on the front passenger-side floorboard. When searched, Petty had a credit card in his name that ended with the same four numbers on the Best Buy receipt.

¶ 8    The trial court, which viewed the surveillance video, denied the motion to quash. While noting that without the recovery of the UPC labels Petty would have been charged only with driving on a suspended license (625 ILCS 5/6-303(a) (West 2012)) and not retail theft, the trial court held that the active investigation for retail theft involving UPC labels justified the seizure.

¶ 9                                    II. Trial Testimony

¶ 10        In opening statements, the State described its theory of the case as the "ol' switche[ ]roo." The evidence adduced at trial expanded the facts established at the motion to suppress. Runkle, the store manager, testified that the BluRay players came in larger boxes than the DVD players and both products had Sony bar codes printed on the outside of the box. Each item's bar code was associated with one product "making it impossible to ring up a $399 product for $41.99." Best Buy store personnel were trained in "processing transactions" (scanning barcodes and ringing up sales), though not on recognizing specific products and their value. The only way a product would scan for the lower price would be either a manager's override authorizing this type of price reduction or someone placing a barcode with the wrong price on the box.

¶ 11        Runkle's inventory revealed two extra DVD players and two missing BluRay players. Runkle then looked for transactions by reviewing the purchase receipts for both items. He located a receipt for two DVD players with the date, time, and register location stamped at the top. Using this information, Runkle pulled the surveillance video for that day. At one point there was a man in the "home theater" section who later can be seen checking out with two BluRay players in his cart. As the man passed through the "sensor alarms," a "protection specialist" approached to check the receipt. "Protection specialists" check customers for a receipt before leaving the store but do not verify whether the receipt matches the product. Since the product was scanned at checkout, it is "assumed" that "what was scanned is on the receipt."

¶ 12        The receipt belonged to a credit card transaction for a "Ronald Petty." Runkle called Officer Bruni and his partner to report the theft. Runkle knew the officers from previous contacts. When the officers arrived, Runkle explained what happened and gave them the purchase receipt and the surveillance video.

¶ 13        About two hours after the officers departed, Runkle saw the man in the surveillance video walk into the store. Runkle recognized him because he was wearing the same jacket, had the same build and hairstyle, and had his arm in a sling. Runkle called the officers and explained the situation. Twenty minutes after the man left the store, the officers returned with some UPC labels. Runkle scanned them—two of the bar codes were for DVD players from Best Buy, and one was for a different product carried by Best Buy.

¶ 14        Officer Bruni testified to the same facts as at the pretrial hearing. The defense presented no witnesses.


¶ 15                                   III. Closing Argument

¶ 16        In the closing argument, the prosecutor argued that Petty failed to explain why he had the UPC labels in his car. Defense counsel did not object to the following: "The circumstantial evidence [is] this defendant has these stickers in his car. You see he wasn't expecting to get pulled over on March 22nd. He didn't know enough to hide these. These are the stickers that he has no reasonable explanation for."

¶ 17        The prosecutor argued further that the videotape showed Petty standing in front of the boxes in the electronics department for 90 seconds. The prosecutor said:

            "That was enough time for [Petty] to take a sticker just like this one and place it on the box and take it up to the register. And, take his chances with the cashier [who Runkle testified] is trained to run the register and ring up purchases. They are not

                                         - 3 -

trained to be experts in merchandise. They are not trained to recognize this package is $400 and this package is $40. In your personal experience with a cashier in a place like that it often is young teenager. Someone in their early twenties. They are ringing up. They are taking the credit card like they are in a zombie zone. Just doing their job. It's not their job to know the difference between those two packages."

¶ 18    Petty was convicted of felony retail theft (720 ILCS 5/16A-3(b) (West 2010)) and sentenced to two years in prison.

¶ 19                                  ANALYSIS
¶ 20              I. Motion to Quash Arrest and Suppress Evidence
¶ 21    A trial court's ruling on a motion to suppress presents mixed questions of law and fact. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). We defer to the trial court's factual findings and will reverse only if those findings are against the manifest weight of the evidence. *Id.* But in deciding what relief should be granted, we assess the facts in relation to the issues and may draw our own conclusions. *Id.* We may consider testimony presented at trial, as well as that provided at the suppression hearing. *People v. Rhinehart*, 2011 IL App (1st) 100683, ¶ 9. We review *de novo* the trial court's ultimate legal ruling. *Id.*

¶ 22    The trial court found Bruni's testimony credible, and we defer to this finding. We turn to whether the search and seizure was unreasonable or unlawful.

¶ 23                          A. Search Incident to Arrest
¶ 24    A warrantless search of an arrestee's car may be conducted only when the arrestee is unsecured and within reach of the passenger compartment or there is a likelihood of discovering offense-related evidence. *Arizona v. Gant*, 556 U.S. 332, 351 (2009). Petty maintains that the search of his car and seizure of the UPC labels was not justified as a search incident to an arrest as (i) the labels were unrelated to the traffic stop for driving on a suspended license, his only offense, and (ii) he was not within reach of his car at the time of the search. Bruni testified Petty was "in custody" and not within reach of his car. So Petty asserts that the State cannot prevail on the latter basis. We reach the same conclusion as the trial court—Petty was stopped while under investigation for the retail theft as well as for driving on a suspended license.

¶ 25    Officer Bruni and his partner were experienced police officers on the tactical team investigating retail crimes. Bruni testified about the methodical steps taken in the investigation of the retail theft—the discovery of the inventory discrepancy, the transaction receipts, and the surveillance video. There can be no dispute that the officers were following Petty as the next step in their investigation.

¶ 26    Petty relies on *People v. Bridgewater*, 235 Ill. 2d 85 (2009). There, the trial court suppressed a gun and an ammunition clip found inside the defendant's car after his arrest for refusing to respond to a police officer. The defendant was handcuffed and placed in a squad car before the police recovered ammunition in the console and a gun under a seat. The offense was based entirely on defendant's failure to obey the police officer's commands. Our supreme court concluded that the police officers could not have reasonably believed evidence of obstructing a peace officer could have been found inside the car. *Id.* at 95. By analogy, Petty

claims his arrest was based entirely on driving on a suspended license. Not so. As noted, the police officers were investigating Petty for possible retail theft, but they soon discovered he was driving without a valid license and initiated the traffic stop as a result. The officers had reason to believe that a more serious crime had occurred. There need be only sufficient evidence to justify the reasonable belief that the defendant has committed or is committing a crime. *People v. Jones*, 215 Ill. 2d 261, 273-74 (2005).

¶ 27                                    B. Probable Cause

¶ 28     The plain-view doctrine allows the police to seize property without a warrant. *Id.* at 271. The doctrine requires that (i) the officer was lawfully in a position from which he observed the property, (ii) the incriminating character of the property was immediately apparent, and (iii) the officer had a lawful right of access to the property. *Id.* at 271-72. The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity. *Id.* at 272 (citing *Texas v. Brown*, 460 U.S. 730, 741-42 (1983)).

¶ 29     Petty argues that the plain-view exception to the warrant requirement does not justify the seizure of the UPC labels, as the incriminating nature of the UPC labels was not immediately apparent. *People v. Bunch*, 327 Ill. App. 3d 979, 983-84 (2002) ("Suspicions, no matter how reasonable, do not amount to probable cause ***."). Petty also complains that the trial court erroneously relied on the UPC labels "matching" the DVD players sold at Best Buy and referred to them as "the very same stickers" on the BluRay players. Petty is correct that at the time the officers saw the UPC labels they did not know as a certainty whether any of them pertained to Sony DVD players sold at Best Buy. But that is not meaningful because probable cause does not require proof beyond a reasonable doubt. See *People v. Humphrey*, 361 Ill. App. 3d 947, 951 (2005) ("immediately apparent" or "probable cause" element does not require officer to "know" item he or she sees is contraband or evidence of crime).

¶ 30     In *People v. Adams*, 131 Ill. 2d 387, 398 (1989), cited by Petty, our supreme court addressed the standard for making a probable cause determination for a warrantless seizure of evidence. Review of the trial court's determination "cannot be tainted by hindsight which may luckily seem to be supported by the fruit of some criminality; rather, the review must center on the information available to the officers preceding the search or arrest." *Id.* In other words, "[w]ould a reasonable person in that officer's position believe that a crime was being or had been committed?" *Id.* (citing *People v. Tisler*, 103 Ill. 2d 226, 237 (1984)).

¶ 31     A mere hunch is insufficient to support the seizure, but a police officer views the facts "through the lens of his police experience and expertise" and "may draw inferences based on his own experience in deciding whether probable cause exists." *Ornelas*, 517 U.S. at 699-700. Bruni and his partner were experienced police officers on the tactical team investigating retail crimes. They had just interviewed the Best Buy store manager and viewed the surveillance video. The police officers could draw an inference from the totality of the information available to them that the UPC labels were related to the recent theft. The officers knew the credit card transaction was in Petty's name and recognized Petty from the surveillance video in terms of his physical characteristics, his jacket, and the sling supporting his left arm. Also, the store manager had told the officers that storewide thefts had occurred involving falsified bar codes. UPC barcodes were the *modus operandi* in accomplishing the theft. So otherwise

innocuous UPC labels were incriminating because the thefts that had occurred involved the scanning of UPC labels on checkout, establishing more than a mere suspicion.

¶ 32 We find support in *Brown*, 460 U.S. at 741, where the United States Supreme Court discussed the concept of an object's "immediately apparent" criminality, calling the phrase "very likely an unhappy choice of words." Rather, "probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' [citation], that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id.* at 742 (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

¶ 33                                   II. Improper Closing Argument

¶ 34 Petty also argues that the prosecutor made multiple improper remarks in closing, the cumulative effect of which prejudiced him. Specifically, Petty claims that the prosecutor's argument shifted the burden of proof, commented on Petty's post-arrest silence and his failure to testify, and argued facts not in evidence. Petty acknowledges that he did not properly preserve the issue of prosecutorial misconduct during argument. But he urges us to review this issue under the plain error doctrine. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The plain error doctrine allows a reviewing court to remedy a "clear or obvious error" when (i) the evidence is so closely balanced that a jury's verdict may have resulted from the error and not the evidence or (ii) the error is so serious that the defendant was denied a substantial right. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). "[T]he first step in [our] plain error review is to determine whether any error occurred." *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 34 (citing *People v. Lewis*, 234 Ill. 2d 32, 43 (2009)).

¶ 35 The standard of review for error in closing arguments remains unclear. *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 55; *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 74. Our supreme court has employed both a *de novo* standard of review (*People v. Wheeler*, 226 Ill. 2d 92, 121 (2007)) and an abuse-of-discretion standard (*People v. Blue*, 189 Ill. 2d 99, 128 (2000)). Either standard leads to the same result here (*Sandifer*, 2016 IL App (1st) 133397, ¶ 55; *Kelley*, 2015 IL App (1st) 132782, ¶ 76), and we need not resolve this inconsistency.

¶ 36 In general, the prosecution is given "wide latitude" in making its closing argument. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Additionally, where a jury is properly instructed regarding the role of arguments and informed that arguments are not evidence and not to be considered as evidence, we presume the jury will follow the admonition. *People v. Sutton*, 353 Ill. App. 3d 487, 501 (2004). In reviewing comments made at closing argument, the question is whether the comments engender prejudice against the defendant so substantial that a fair trial is impossible. *Wheeler*, 226 Ill. 2d at 123; see *People v. Easley*, 148 Ill. 2d 281, 332 (1992) ("The remarks by the prosecutor, while improper, do not amount to substantial prejudice.").

¶ 37 The State referred to the UPC labels as "the stickers that [Petty] has no reasonable explanation for." Petty asserts this remark impermissibly comments on his failure to testify. In deciding whether an improper comment has been made about a defendant's exercise of his right not to testify, courts consider whether the reference was intended or calculated to direct the attention of the jury to the defendant's waiver of his or her right to testify. *People v. Arman*, 131 Ill. 2d 115, 126 (1989) (State may not make direct or indirect comment on defendant's

basic due process right not to testify). The reviewing court examines the challenged comments in the context of the entire record. *Id.*

¶ 38    The "no reasonable explanation" remark was made in the context of the evidence establishing that the product bar codes scanned by the cashier were not the proper bar codes for the BluRay players. The question of fact for the jury to decide was how the falsified bar code ended up on the BluRay player boxes. The State argued the inferences that could be drawn from the evidence presented—the receipt, the surveillance video, and the UPC labels found in Petty's car.

¶ 39    The prosecutor argued further that cashiers are not experts in merchandise and are not trained to recognize the relative value of different items. We do not condone calling the cashiers "zombies," but the remark appears in Runkle's testimony about Best Buy's training for clerks and "protection specialists." The prosecutor urged the jurors to rely on their personal experience and argued the store cashiers are trained to "run the register and ring up purchases. They are not trained to be experts in merchandise."

¶ 40    The trial court instructed the jury to "consider all the evidence in the light of your own observations and experience in life." The unfortunate addition of "zombie" to characterize the actions of store cashiers is not particularly helpful. The prosecutor merely commented on Runkle's testimony on store personnel.

¶ 41    Petty cites *People v. Abadia*, 328 Ill. App. 3d 669, 678-79 (2001), granting a new trial because the cumulative effect of multiple instances of prosecutorial misconduct cast doubt on the integrity of the verdict. In *Abadia*, this court quoted 22 excerpts of objectionable statements made by the prosecutor during the rebuttal argument that focused on the defendant's purportedly fabricated defense. The cumulative effect of multiple objectionable statements in *Abadia* was undeniable and a far cry from the situation here.

¶ 42    Nor do we consider the evidence closely balanced. The State presented evidence that established the steps taken in the investigation from the discovery of the inventory discrepancy through Petty's arrest. The evidence, while circumstantial, was more than sufficient to connect Petty with the purchase and to infer intent to "alter, transfer, or remove [a] label, price tag, marking, indicia of value or any other markings which aid in determining value affixed to any merchandise displayed, held, stored or offered for sale" as defined by the retail theft statute in effect at that time. See 720 ILCS 5/16A-3(b) (West 2010). "When it is clear that the alleged error would not have affected the outcome of the case, a court of review need not engage in the meaningless endeavor of determining whether error occurred." *People v. White*, 2011 IL 109689, ¶ 148.

¶ 43    The prosecutor's closing remarks did not constitute reversible error, and they certainly did not rise to the level of plain error. While instructing the jury that arguments are not evidence will not, in every instance, constitute a cure, the State's remarks were not inflammatory or emotional, nor did they demonstrate "a pervasive pattern of unfair prejudice." *Blue*, 189 Ill. 2d at 139.

¶ 44                                    III. Ineffectiveness of Counsel

¶ 45    Finally, Petty asserts his defense counsel was ineffective for failing to object to the "acts of misconduct." Having found the prosecutor's comments in closing argument were not improper, it follows that the issue would have been similarly meritless if defense counsel

objected. Counsel was not ineffective for failing to make a meritless objection. *People v. Easley*, 192 Ill. 2d 307, 329 (2000) ("[I]t is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong."). We find no ineffective assistance of counsel because there was no error (*People v. Ivory*, 217 Ill. App. 3d 619, 625 (1991)) and Petty suffered no prejudice.

¶ 46                                    IV. Fees

¶ 47        Finally, defendant contends, and the State agrees, that the $5 electronic citation fee was erroneously imposed and should be vacated. Section 27.3e of the Clerk of Courts Act specifies that this fee applies only to a defendant who is involved in "any traffic, misdemeanor, municipal ordinance or conservation case." 705 ILCS 105/27.3e (West 2012). Petty was convicted of retail theft. Additionally, for each day of incarceration before sentencing, a defendant is entitled to a credit of $5 toward the monetary assessments levied against him as part of his conviction. 725 ILCS 5/110-14(a) (West 2012). Petty served 36 days in presentence custody and had accumulated $180 of credit toward his eligible fines and fees. Finally, the State agrees Petty deserves a presentence incarceration credit for the $15 state police operations fee (705 ILCS 105/27.3a(1.5) (West 2010)) and a presentence incarceration credit toward the $50 court system fee levied under section 5-1101(c) of the Counties Code (55 ILCS 5/5-1101(c) (West 2010)). We vacate the $5 electronic citation fee, and we modify Petty's fines to reflect the $15 credit for the state police operations fee and the $50 court system charge. The judgment of the trial court is affirmed in all other respects.

¶ 48        Affirmed as modified.