THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEROME HENDRICKS, Defendant-Appellant.

First District (1st Division)   No. 1—91—2922

Opinion filed September 7, 1993.

Rita A. Fry, Public Defender, of Chicago (Lester Finkle, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Noreen M. Daly, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendant Jerome Hendricks was found guilty of first degree murder, aggravated criminal sexual assault, aggravated kidnapping, kidnapping, unlawful restraint and concealment of a homicidal death. Defendant was sentenced to natural life imprisonment for murder plus concurrent sentences for the remaining offenses, the longest of which was 30 years' imprisonment for criminal sexual assault. These sentences run consecutively to the natural life sentence.

The record on appeal indicates the following facts. Before trial, defendant moved to quash his arrest and suppress statements he made to the authorities following that arrest. Following a hearing, the trial court denied this motion. The testimony elicited during the pretrial hearing will be discussed below as necessary.

At trial, Yolanda Hill testified that she was the 23-year-old cousin of Denise J. On August 1, 1988, Ms. Hill lived at 11720 South Princeton in Chicago. Denise J. was 12 years old at that time and lived with Ms. Hill's mother, Estelle Fields.

Ms. Hill testified that Denise J. came over to her house on August 1, 1988, to baby-sit Ms. Hill's children. Denise J. was approximately five feet tall and weighed approximately 100 pounds. According to Ms. Hill, Denise J. arrived wearing a black tank top, white knee pants, white socks and white gym shoes. The shoes were "Princess" brand; the name "Denise" was written in red ink on the outside of the instep of the left shoe.

At 5:15 p.m. on the evening at issue, Ms. Hill, her two children, her housemate Karlena McCoy and Denise J. were all at Ms. Hill's home. Ms. Hill and McCoy went out onto the porch to discover Denise J., who had Ms. Hill's children with her, speaking with defendant. Ms. Hill told defendant he was not welcome on her porch, took her baby from defendant and gave the child to Denise J. Ms. Hill bent over and told Denise J. that defendant had just been released from jail for rape. Denise J. took the baby indoors and went upstairs. Ms. Hill told defendant that Denise J. was 12 years old and was not allowed to speak to any men. McCoy told defendant to leave, which defendant did after arguing with Ms. Hill and McCoy for 5 to 10 minutes.

Later that evening, after Denise J. spoke to Ms. Hill, Denise J. was allowed to go out onto the porch for five minutes. Ms. Hill checked on Denise J. five minutes later; Denise J. had disappeared. Ms. Hill never saw Denise J. alive again.

On cross-examination, Ms. Hill denied that she had ordered Denise J. off the porch or that the two fought thereafter. She also denied that Denise J. was a runaway or that she had told the police this.

James Hill, another cousin of Denise J., testified that on the morning of August 2, 1988, he drove his mother to Ms. Hill's home. Mr. Hill testified that after arriving, he saw defendant coming down the street. Mr. Hill asked defendant whether he had seen Denise J. Defendant stated that he had not. Mr. Hill told defendant that Ms. Hill and McCoy had seen him with Denise J. and described Denise J. Defendant indicated that he had seen Denise J. on his porch at 9:30 p.m. with his nephew. According to Mr. Hill, defendant later told him that defendant had seen Denise J. on 119th Street and told her to go home.

Michael Walker testified that he was approached by defendant on August 2, 1988. According to Walker, defendant told him that the police were looking for defendant. Walker testified that defendant wanted him to say he was with defendant on the night Denise J. disappeared. Walker indicated that he had not been with defendant; rather, he had been searching for Denise J. that evening.

On cross-examination, Walker admitted that he was close to McCoy and Denise J.'s family. Walker admitted that he said nothing of his conversation with defendant to either the police or Denise J.'s family until after defendant was arrested and placed in custody. Walker further admitted that he had been convicted twice for selling cocaine and was currently in prison. Walker testified that the State had promised only to write a letter to the warden indicating that Walker had testified truthfully in court. Walker indicated that he might receive one month of relocation costs from the State upon his release from prison.

Chicago police officer John Fassl testified that on August 8, 1988, he and his partner received a call regarding a suspicious odor coming from a garage at 251 W. 117th Street. Fassl indicated that the garage was located behind an abandoned house at that address. Upon entering the garage, Officer Fassl discovered the body of a young girl in the southeast corner of the garage. The girl was lying on her stomach and her hands were bound behind her back with what appeared to be a set of shoelaces. The girl's pants were unfastened, her bra straps were pulled down and her top was tied around her neck. The girl was wearing her right shoe; the left shoe, found near the girl's head, had the name "Denise" written upon it with a red marker. The shoes were Princess brand.

According to Officer Fassl, the girl's top was tied around her neck at chin level and a shoelace was tied around her neck near the shoulders. When the body was discovered, there were garbage bags thrown on top of it. Officer Fassl testified that the body was in a high state of decomposition; fluid seeped from the body when it was turned over, there was skin slippage from the face and a large maggot infestation in and around the body and the garbage area.

Officer Fassl also identified a photograph taken from the front porch of 11720 S. Princeton. The photograph indicates that the garage where the body was discovered can be seen from the front porch of the building where Denise J. had been at the time of her disappearance.

Doctor Mary Jumbelic, a forensic pathologist, testified that she performed an autopsy on the body on August 9, 1988. Dr. Jumbelic indicated that the girl's pants were unbuttoned, unzipped and pulled down slightly. Dr. Jumbelic found that the shoelace ligature on the neck measured three inches in diameter, indicating that the shoelace had been pulled extremely tight. Grooves from the shoelaces were also found on the wrists. Dr. Jumbelic was unable to determine whether a sexual assault had taken place, due to the decomposition and tissue loss in the genitalia area. Dr. Jumbelic opined that the death was caused by strangulation.

On cross-examination, Dr. Jumbelic indicated that autoeroticism—the practice of tying something around one's neck to enhance a sexual experience—is not seen often among females. Dr. Jumbelic indicated that she had never heard of a case involving a female.

Area Two Violent Crimes Detective Lawrence Nitsche also testified for the State. The parties also stipulated to Detective Nitsche's testimony from the pretrial motion to quash and suppress, much of which is detailed here. Nitsche testified that he was assigned to investigate the Denise J. homicide the afternoon the body was discovered. Nitsche spoke to Ms. Hill and McCoy, who told him substantially those things to which Ms. Hill testified at trial. In particular, McCoy told Detective Nitsche that defendant had been arrested before regarding a sexual matter with a young girl. Detective Nitsche testified that he spoke to a woman named Paula Townsend, who told him that she saw Denise J. speaking with defendant on the night Denise J. disappeared. Townsend heard defendant ask Denise J. "Would that be okay," to which Denise J. responded that it would. Townsend then saw Denise J. walk toward 119th Street and defendant walk toward his home. Detective Nitsche also interviewed Mr. Hill, who told Detective Nitsche about conversations he had with defendant after Denise J.'s

disappearance. According to Detective Nitsche, defendant initially told Mr. Hill that he had not seen Denise J. on the night of her disappearance, but later told Mr. Hill that he had seen her on 119th Street and still later told Mr. Hill that he saw her on 117th Street.

As a result of these interviews, Detective Nitsche conducted a background check of defendant. Detective Nitsche learned that defendant was then on parole from a conviction for criminal sexual assault. Detective Nitsche indicated that the victim in that case had been strangled, though apparently not to the point of death. Detective Nitsche also learned that defendant had been arrested for another criminal sexual assault that occurred at 251 W. 117th Street.

Based on this information, Detective Nitsche and other police officers began looking for defendant. The police were unable to find him at home and left a message that they wanted to speak with him. Defendant contacted the police later that evening, which led to defendant's arrest. The testimony of the police officers conflicted with the testimony of defendant and his family regarding the circumstances of his arrest. It is noted at this juncture that the trial court determined that the police effected a warrantless, nonconsensual arrest in defendant's home, but that the arrest was valid because it was supported by probable cause.

At trial, Detective Nitsche testified that he conducted an initial interview with defendant at Area Two Police Headquarters on the evening of August 8, 1988. Defendant told Detective Nitsche that between 6 p.m. and 9 p.m. of the night at issue, he was at his friend Tom's home, which was across the street from his own home. After returning home for a short time, he went to Pullman Park, where he met Walker and a woman. Defendant then went to the Everett White School playground, where he drank and played basketball until 4:30 a.m. According to Detective Nitsche, defendant never indicated that he saw Denise J. on the night of her disappearance.

Detective Michael Baker testified that defendant was then taken for an interview at 11th and State and later returned to Area Two Police Headquarters for a third interview. Detective Baker testified that during the third interview, defendant admitted that he talked to Denise J. on the night of her disappearance. Defendant told Detective Baker that Denise J. went to get ice cream for defendant and that he later saw Denise J. in front of his house talking to his nephew. Defendant then went to play basketball at the Everett White School. Defendant indicated he played basketball with someone named "Shorty Mac" and walked out with Michael Walker. Defendant then went to meet his girl friend at 119th Street and Michigan. When

defendant returned home early the next morning, family members informed him that the police were looking for him.

After defendant made this statement, Detective Baker went to Pullman Park and the Everett White School, but was unable to find "Shorty Mac," Walker, or anyone who saw defendant at these locations on the night in question.

Detective John Yucaitis testified that on August 9, 1988, he and his partner spoke with the detectives investigating this homicide. Thereafter, Detective Yucaitis and his partner canvassed the area where the body was found. Later that afternoon, Detective Yucaitis and his partner spoke with defendant. Detective Yucaitis told defendant that he did not believe defendant's account of his whereabouts on the night at issue.

According to Detective Yucaitis, defendant stated that he had not told the whole truth because he was on parole for rape and feared that he would not be believed. Defendant then told Yucaitis that on August 3 or 4, 1988, he noticed the odor coming from the garage at 251 W. 117th Street. Defendant entered the garage and noticed the body on the floor. Defendant stated that he did not report his discovery to anyone due to his background.

Detective Yucaitis told defendant that he thought defendant was withholding information and asked whether defendant had sex with the girl. Detective Yucaitis told defendant that tests could be done to determine whether defendant had sex with the girl. Defendant indicated that he wanted to think for awhile, at which time Detective Yucaitis and his partner left the interview room.

According to Detective Yucaitis, defendant asked to see him later that evening. Defendant asked whether he could get in trouble if he admitted having sex with the girl; Detective Yucaitis responded in the affirmative. Defendant then admitted having sex with the girl, but insisted that it was consensual. Defendant denied ejaculating into the girl. The conversation was then terminated.

Later that evening, Detective Yucaitis returned with Detective Joann Ryan. Detective Yucaitis left the room after defendant indicated that he wanted to speak with Detective Ryan alone.

Detective Ryan testified that defendant told her that the girl had "hit" on him all day on the date at issue. According to defendant, he and the girl had sex near a car parked behind 11720 S. Princeton and that he left afterwards. Defendant told Detective Ryan that the girl then chased him and led him to the garage at 251 W. 117th Street. Defendant stated that the girl hugged him, kissed him and asked that he not tell anyone she had been with him. According to defendant,

the girl then took her pants down and pulled her top over her head. Defendant then had vaginal intercourse with the girl from the rear. Defendant told Detective Ryan that the girl had something like a gag that she stuck in her mouth and asked defendant to hold it, pull on it and "ride her like a horse."

According to Detective Ryan, defendant admitted ejaculating in the girl. Defendant stated that the girl again asked him not to tell anyone what had happened. Defendant stated that he then left for Pullman Park.

Assistant State's Attorney Anna Democopolous testified that she took a handwritten statement from defendant after 10 p.m. on August 9, 1988. This statement was substantially similar to the oral statement defendant gave to Detective Ryan, adding that he did not look back at the girl as he left the garage and knew that she did not leave with him. Defendant also related his discovery of the body several days later. Defendant indicated that the girl and the girl's top were in the same position as when he initially left the garage. Defendant denied killing, raping or secretly confining the girl.

Phyllis Williams testified that on June 30, 1984, she was living at 7416 Phillips. As she left her apartment that day, she saw defendant sitting in the hallway. Williams testified that as she passed the defendant, he grabbed her from behind and put a knife to her neck. Williams testified that defendant then dragged her into his apartment and threw her on a couch.

Williams indicated that defendant then pulled a rope from the side of the couch and wrapped it twice around her neck. Defendant then told her to take a leg out of her pants, after which he twice had forcible intercourse with Williams. Williams testified that during these episodes, defendant pulled on the rope around her neck, threatening to kill her.

On cross-examination, Williams admitted that she went to a game room with defendant after these episodes. Williams indicated that she wanted to get out into the public. Williams further indicated that while she appeared in court, the case was dismissed.

Stephanie Smith testified that she lived at 7416 Phillips in September 1984. On September 3, 1984, Smith saw defendant standing inside the building as she entered. Smith testified that as she walked up the stairs, defendant grabbed her from behind, dragged her into a basement apartment and put her in a closet for 10 to 15 minutes. Smith testified that defendant forcibly raped her after removing her from the closet.

Smith testified that she was 15 years old at the time and that she told defendant this. Smith indicated that as she left the apartment, defendant grabbed her around the neck and threatened to kill her if she told anyone what had happened.

The trial court indicated that he would consider the testimony of Williams and Smith only to the extent of similarities to the case on trial.

Defendant called Chicago police youth officer Steve Matkovich, who testified that on August 2, 1988, he began investigating Denise J.'s disappearance as a missing persons case. Officer Matkovich's report indicated that he had spoken with Ms. Hill as part of that investigation. The report indicated that Ms. Hill stated that she had an "altercation" with Denise J. regarding defendant before Denise J. disappeared.

Estelle Fields, Denise J.'s legal guardian, testified that she spoke with a youth officer on August 3, 1988, regarding Denise J.'s disappearance. Fields denied telling this officer that Denise J. had previously run away from home and denied that Denise J. had ever run away from home. Fields also denied telling the officer that the only interest Denise J. had was boys and that Denise J. was a problem child.

Officer David Kaddigan testified that on August 7, 1988, he canvassed the area of 105th and State. Officer Kaddigan showed a photograph of Denise J. to two women who told him that they lived at 10537 S. State. According to Officer Kaddigan, these women stated that they saw Denise J. on August 2, 1988. The trial judge ultimately struck this testimony as hearsay.

Youth officer Daniel Gryzb testified that he was conducting a follow-up investigation on a missing 12-year-old. Officer Gryzb testified that he spoke with Estelle Fields, who told him that Denise J. was a problem child. Officer Gryzb denied that Fields also indicated that Denise J. was interested in boys or men.

Another youth officer assigned to the missing persons case, Donna Padgurskis, testified that Fields told her that Denise J. had occasionally socialized with older men or boys. However, Fields also told Officer Padgurskis that Denise J. socialized with girls and was not sexually active. According to Officer Padgurskis, Fields stated that Denise J. had previously gone to her grandfather's home without Fields' permission. However, Fields did not tell Officer Padgurskis that Denise J. was a problem child.

Following closing arguments, the trial court found defendant guilty of first degree murder. The trial court also found defendant

guilty of criminal sexual assault based on the ages of defendant and Denise J. The trial court further found defendant guilty of aggravated kidnapping, kidnapping, unlawful restraint and concealment of a homicidal death. Defendant was found not guilty of criminal sexual assault based upon the use of force.

The trial court later denied defendant's post-trial motion.

Subsequently, the trial court found defendant eligible for a death sentence because defendant committed murder in the course of a criminal sexual assault and aggravated kidnapping. At a hearing regarding aggravating and mitigating factors, the State introduced evidence that the offenses were committed while defendant was on parole. The State also had Fields testify as to the impact of the murder upon her and her family. Defendant presented no witnesses in mitigation. The trial court ultimately sentenced defendant to natural life imprisonment for murder plus concurrent sentences for the remaining offenses, the longest of which was 30 years' imprisonment.

Defendant timely filed a notice of appeal to this court.

I

Defendant initially contends that the trial court erred in denying his motion to quash his arrest and suppress evidence. The trial court indicated that the warrantless arrest of defendant in his home was nonconsensual, in violation of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. The trial court nevertheless ruled that defendant's statement was admissible because the statement was not given in defendant's home and the arrest was supported by probable cause. (See *New York v. Harris* (1990), 495 U.S. 14, 109 L. Ed. 2d 13, 110 S. Ct. 1640.) Defendant argues that the police lacked probable cause for arrest.

Probable cause for arrest exists where the totality of the circumstances known to the police officers at the time of arrest would lead a reasonably prudent person to believe that the suspect is committing or has committed a crime. The officer must have more than a mere suspicion of guilt, but need not have evidence sufficient to convict the suspect. The decision to arrest relies upon factual and practical considerations of everyday life upon which a reasonable, prudent person (rather than a legal technician) acts. Thus, a trial court's finding of probable cause will not be disturbed unless it is manifestly erroneous. See *People v. Cabrera* (1987), 116 Ill. 2d 474, 485-86, 508 N.E.2d 708, 712.

Many factors are relevant to a determination of probable cause, including but not limited to: (1) the proximity of defendant's abode to

the scene of the crime; (2) information that defendant had committed a similar offense; (3) whether the nature of the offense was both violent and serious; (4) whether defendant was among the last to see the victim alive; and (5) whether it appears that defendant has made false exculpatory statements or offered differing explanations. (See *People v. Williams* (1992), 230 Ill. App. 3d 761, 776, 595 N.E.2d 1115, 1125 (factors 1 through 4); *People v. Tyler* (1984), 128 Ill. App. 3d 1080, 1088, 471 N.E.2d 968, 975 (factor 5).) When police officers are working in concert in investigating a crime or possible crime, probable cause may be established from their collective knowledge, even if it is not within the personal knowledge of the arresting officer. See *People v. Fenner* (1989), 191 Ill. App. 3d 801, 806, 548 N.E.2d 147, 151.

■ Defendant does not dispute that the record establishes that at least one very serious violent crime occurred in this case. The record indicates that at the time of defendant's arrest, Detective Nitsche had information from Mr. Hill that defendant had initially stated that defendant had not seen the victim, but defendant's statement was not consistent with later conversations between defendant and Mr. Hill and information Nitsche had received from Ms. Hill, McCoy and Townsend. Nitsche had information suggesting that defendant was one of the last persons to see the victim alive on the night of her disappearance. Nitsche had information from McCoy that defendant "had been arrested before for doing something with a girl."

This information prompted Nitsche to conduct a background check of defendant that revealed defendant was on parole from a conviction for criminal sexual assault. Nitsche learned that the case had elements of strangulation and sexual molestation. Other entries on defendant's "rap sheet" alerted Nitsche to another prior arrest for criminal sexual assault. The complainant in this prior instance had lived at 251 West 117th Street. In this case, the victim's body was discovered in a garage at 251 West 117th Street. The record shows this garage was next door to defendant's abode. Given these factors, the police were entitled to more than a mere suspicion that defendant committed the crimes with which he was charged.

Defendant notes that the Area Two Youth Division, which was investigating the victim's disappearance as a missing persons case, had information that the victim was interested in men, that the victim had run away previously and that two females claimed to have seen the victim alive on August 2, 1988. The record indicates that the Area Two Violent Crimes detectives were not aware of the relevant youth division reports at the time of the arrest. Thus, it was not manifestly

erroneous to conclude that the youth division was not working "in concert" with the violent crimes detectives on this case.

## II

Defendant contends that the State failed to prove him guilty of murder beyond a reasonable doubt. The relevant inquiry on appeal is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, after viewing the evidence in the light most favorable to the prosecution. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889, 903.) It is axiomatic that determinations of the credibility of witnesses and the weight to be given to their testimony are the functions of the trier of fact. Indeed, where the defendant's testimony is the sole evidence of what actually occurred, the trier of fact is not obligated to accept all or any part of that testimony, but may assess the probabilities, the reasonableness of any defense offered and reject any or all of defendant's account in favor of the State's circumstantial evidence of guilt. (*People v. Boone* (1987), 152 Ill. App. 3d 831, 835, 504 N.E.2d 1271, 1274.) A conviction based upon circumstantial evidence must be based on proof of a conclusive nature that tends to lead to a satisfactory conclusion and produces a reasonable and moral certainty that defendant and no one else committed the crime. (*People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801, 804.) This court will not disturb a guilty verdict unless the evidence is so improbable or unsatisfactory that it raises a reasonable doubt as to defendant's guilt. *People v. Brandon* (1990), 197 Ill. App. 3d 866, 874, 557 N.E.2d 1264, 1269.

In this case, Assistant State's Attorney Democopolous read the written statement she took from defendant on August 9, 1988. In the statement, defendant admitted having sex with the victim in the garage next door to his home. Defendant stated that the victim's shirt was pulled over her head during the intercourse. Defendant stated that the victim pulled the shirt over her head and further encouraged him to pull on something around her face, which may have been a shoelace. Defendant stated that the victim did not accompany him when he left the garage. Defendant indicated that after hearing complaints from his family about an odor coming from the garage he returned to the garage and found the victim with her shirt "still in the same position over her head."

The record in this case also indicates that defendant gave Hill and the police varying accounts of the events of the evening at issue; each of these tended to be more inculpatory than the last. The record indicates that the day after the victim disappeared, defendant asked

Walker to fabricate an alibi for defendant. The record further contains the testimony of two women regarding their encounters with defendant. A reasonable trier of fact could infer from their accounts that it was defendant's *modus operandi* to use the threat of strangulation to coerce sex from a woman or to intimidate a woman from revealing a sexual encounter.

Viewing this evidence in the light most favorable to the prosecution, a reasonable trier of fact could conclude that defendant murdered the victim in this case.

## III

Defendant contends that his sentence of natural life imprisonment is excessive. The record indicates that defendant was found eligible for the death penalty. However, the trial court imposed the natural life sentence after finding that this murder "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(b).) "Heinous" may be defined as hatefully or shockingly evil, grossly bad, enormously and flagrantly criminal; "brutal" may be defined as grossly ruthless, devoid of mercy or compassion, cruel and cold-blooded; "cruelty" may be defined as a disposition to inflict pain and suffering or to enjoy its being inflicted. *People v. Hartzol* (1991), 222 Ill. App. 3d 631, 651, 584 N.E.2d 291, 306.

The imposition of a sentence falls within the sound discretion of the trial court. The trial judge's decision is entitled to great deference as he or she has had the opportunity to assess the subjective circumstances in each case, including the defendant's: (1) character and demeanor; (2) mentality; (3) abnormal and subnormal tendencies; and (4) natural inclination or aversion to commit crime. *People v. Henderson* (1988), 175 Ill. App. 3d 483, 490, 529 N.E.2d 1051, 1055.

In this case, the trial court was aware that defendant was on parole for a criminal sexual assault where defendant had grabbed the then-15-year-old victim by the neck and threatened her with death if she told anyone of the assault. The trial court heard evidence that defendant sexually assaulted yet another woman while pulling on the rope he had wrapped around her neck and threatening to kill her. Given the record on appeal, such evidence is relevant to an assessment of whether defendant showed abnormal tendencies or a natural inclination to commit crime. We also note that defendant presented no witnesses in mitigation in this case.

This court has previously stated in a case involving the rape and murder by strangulation of a 75-year-old woman that the trial court

was "incontestably justified" in imposing a natural life sentence. (*People v. Cole* (1988), 168 Ill. App. 3d 172, 185, 522 N.E.2d 635, 643.) Defendant has offered no compelling reason why a similar conclusion is not warranted in this case. Defendant states in his brief that "[t]he court's own findings were that no forcible rape occurred." The pages of the record cited by defendant in support of this assertion indicate only that the trial judge stated that he could not find that a forcible rape occurred beyond a reasonable doubt due to the decomposition of the body before it was discovered. The trial judge indicated that it was just as likely that defendant murdered the victim after consensual sex to prevent others from learning of it. The trial court acted within its discretion in imposing the natural life sentence, as it could reasonably conclude that both scenarios involve brutal and heinous behavior indicative of wanton cruelty.

## IV

Finally, defendant contends that section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)) violates his constitutional rights to due process and equal protection of the laws. Defendant contends that because the trial judge may sentence him to either natural life or an extended term upon finding brutal or heinous behavior indicative of wanton cruelty (compare Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1) with Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a)(1)), the trial judge's selection of one statutory provision over the other is arbitrary.

■ Defendant acknowledges that this very issue was decided adversely to his position in cases such as *People v. Cartalino* (1982), 111 Ill. App. 3d 578, 591-92, 444 N.E.2d 662, 673, but contends that such cases were decided incorrectly. However, defendant also acknowledges that this court has repeatedly affirmed the rationale of *Cartalino*—that the statutory aggravating and mitigating factors which the trial court must weigh before imposing any sentence limit the trial court's discretion. *E.g., People v. Abernathy* (1989), 189 Ill. App. 3d 292, 318, 545 N.E.2d 201, 218-19; *People v. Burke* (1987), 164 Ill. App. 3d 889, 899-900, 518 N.E.2d 372, 378-79.

Defendant's contention that this reasoning, taken to its extreme, would allow trial judges to select a determinate year sentence in contravention of other sections of the Unified Code of Corrections is unpersuasive. The statutory scheme contains standards that determine whether a defendant receives less than an extended-term sentence. Where a murder is accompanied by brutal and heinous behavior indicative of wanton cruelty, an extended term or natural life sentence is

appropriate, depending on the aggravating and mitigating factors presented in a given case. Defendant's contention that these factors should only be used in determining whether to sentence a defendant to between 60 and 100 years is made without citation to authority and is not supported by case law. Thus, defendant has failed to show that section 5—8—1(a)(1) is unconstitutional.

For all of the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.