FIRST DIVISION

June 29, 1998

No. 1-96-3767

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

FERDINAND DIZON,

Defendant-Appellant.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

Edward M. Fiala, Jr.,

Judge Presiding.

JUSTICE GALLAGHER delivered the opinion of the court:

The victim in this case, Daniel Yum, was shot and killed on April 8, 1994, at approximately 5:15 p.m.  On April 27, 1994, defendant, Ferdinand Dizon, was charged by indictment with first degree murder for the shooting death of the victim.  Defendant filed pretrial motions to quash arrest and suppress evidence and to suppress the lineup identifications; the motions were denied.  On June 3, 1996, after a jury trial, defendant was found guilty.  Defendant's motion for a new trial was denied on August 12, 1996.  On August 28, 1996, following a hearing in aggravation and mitigation, the trial court sentenced defendant to 40 years of imprisonment.  Defendant's motion to reduce sentence was thereafter denied.  Defendant now appeals his conviction and sentence.

On April 8, 1994, between 4:30 p.m. and 5 p.m., Sanday Som received a phone call from a friend, Glen Valdez.  After speaking with Valdez, Som went to a mini-mall located at Lawrence and Kimball in Chicago to help the victim, who had locked his keys in his car.  When Som arrived at the mini-mall he saw Valdez, Danny Kang and the victim.  Valdez got a coat hanger from a nearby store for Som and then left.  While attempting to retrieve the keys with a coat hanger, Som noticed that five or six young men were approaching from the west side of Kimball, which was the street where the victim's car was parked.  These five or six young men were making gang signs and yelling gang slogans including "Akhro," "RSG," "CB," and "Dragon Killer."  Som, a Cambodian, was not a member of a gang but he had heard gang terminology around his school.  Som believed that "Akhro" referred to a Filipino gang because he had heard it yelled out by Filipinos in the past; "RSG" referred to the Red Scorpion gang, a Filipino gang; and "CB" referred to Crime Busters, a Filipino gang.  When one yells "Dragon Killer" it means he is showing disrespect for the mainly Vietnamese gang known as the Dragons.  Som knew the slogans to mean that these young men were members of the Red Scorpion gang.  Som did not know whether Kang or the victim, both Koreans, were members of a gang.

A fight ensued during which Som fought off one boy and Kang fought off another and then ran.  Som and the victim started to run away when defendant, wearing a black shirt, ran towards them.  Som could see defendant's face because he was only a few feet away and it was daylight.  Som and the victim continued running into the mini-mall parking lot.  Som looked back and saw the defendant pull out a black gun from his waist and shoot the victim.  Defendant then ran southbound.  Later that day, around 10:30 p.m., Som went to the police station, where he identified defendant in a lineup.

At the time the shooting occurred, Officer Fred Allen was making a premise check at the nearby CTA station at 3353 W. Lawrence.  He heard what could have been a gunshot outside and he exited the station.  He proceeded to the corner of Lawrence and Kimball, where he saw two youths running very quickly across the street headed southbound.  When they passed Officer Allen, the first youth dropped a black gun, which the second youth picked up and stuck in his waist or pocket.  Officer Allen, who had drawn his gun, yelled at the youths to stop, but they refused.  The first youth was wearing a black blue or dark colored shirt.  The second youth, codefendant in this case, Francis Calvadores, was wearing a red shirt.

Officer Allen called in a flash message of a man with a gun, along with identifications of the clothing that the two men were wearing, and his belief that they were Latino.  A few minutes later, he heard a radio call that a person had been shot at Lawrence and Kimball and he went to that location.  Sometime after that, Calvadores was brought to him and he identified him as the youth who had picked up the gun.  He also identified the gun, which had been found on Calvadores, as that which he had seen picked up by Calvadores.

In between the time Officer Allen first observed the two youths and the time he identified Calvadores as one of them, Officers James Valenzano and Steven Schwieger, who were nearby in an unmarked police car and who had heard the flash message describing the fleeing youths, drove toward the general area.  They saw two youths fitting the description.  When they told them to stop, Calvadores did, but defendant ran.  Officer Valenzano pursued defendant but was unable to catch him.  During the chase, the defendant looked back several times and Valenzano was able to observe his face.  Immediately after the chase, Valenzano radioed in a corrected description, noting that defendant was not Latino, but was instead Oriental.

Meanwhile, Officer Schwieger had searched Calvadores and found the gun.  Calvadores was placed in a cage car.  Schwieger received a flash message from the cage car that Calvadores would take them to where the shooter could be found.  The officers had also received a flash message that a GEO tracker, license plate number RASEC 44, had been seen leaving the scene of the crime.  When the officers arrived at the third location to which Calvadores had taken them, 3349 W. Sunnyside, Officer Valenzano saw the GEO tracker.

The officers knocked on the door.  At first nobody answered, but officers who were stationed at the rear entrance saw a female open the curtain.  When one of the officers flashed his badge, she went back inside and did not open the door.  The officers could hear movement in the apartment, but still nobody opened the door.  Finally, after 5 or 10 minutes, the door was opened by a man with a shotgun.  The officers entered the apartment.  There they saw defendant and several other Asian males, all of whom were arrested.

Eyewitnesses to the crime, Donald Morgan and Steven Csiki, gave testimony at trial which was corroborative of the above.  In addition, Morgan identified defendant as the shooter.

Defendant's first argument on appeal is that the trial court committed prejudicial error in failing to suppress postarrest evidence because the police had no probable cause to arrest him.  Regarding this issue, the parties disagree as to the proper standard of review we must employ.  A trial court's ruling on a motion to suppress will not be reversed on appeal unless it is manifestly erroneous. 
People v. Kidd
, 175 Ill. 2d 1, 22, 675 N.E.2d 910, 921 (1996).  This "manifestly erroneous" test is proper because suppression motions usually raise mixed questions of law and fact. 
People v. Frazier
, 248 Ill. App. 3d 6, 12, 617 N.E.2d 826 (1993).  It is only when neither the facts nor the credibility of witnesses is questioned that 
de
 
novo
 review is appropriate. 
People v. Sweborg
, 293 Ill. App. 3d 298, 302, 688 N.E.2d 144, 146 (1997).  In the instant case, the defendant clearly challenges the credibility of the State's witnesses.  Thus, 
de novo
 review is inappropriate here.  Nevertheless, based on the facts of this case, our determination regarding probable cause would be the same even if we were to apply a 
de novo 
standard of review.

"Probable cause to arrest exists where the totality of the circumstances known to police officers at the time of arrest are sufficient to warrant a reasonably prudent person to believe that the suspect has committed a crime."  
People v. Patterson
, 282 Ill. App. 3d 219, 227, 667 N.E.2d 1360, 1366 (1996), citing 
People v. Hendricks
, 253 Ill. App. 3d 79, 88,  625 N.E.2d 304 (1993).  When one considers the totality of the circumstances present here at the time of arrest, it is manifestly clear that probable cause to arrest existed.  Furthermore, "[w]hen police officers are working in concert in investigating a crime or possible crime, probable cause may be established from their collective knowledge, even if it is not within the personal knowledge of the arresting officer."  
People v. Hendricks
, 253 Ill. App. 3d 79, 89, 625 N.E.2d 304, 310 (1993).

In denying defendant's motion to quash his arrest and suppress evidence, the trial court summarized some of the facts known to the police at the time of the arrest.  As the record, including the tape of the police radio transmissions, indicates, there was a plethora of information known collectively by the police at the time of the arrest.  We will briefly summarize some of those factors here to illustrate why it is undeniable that the totality of the circumstances known to police officers at the time of arrest were sufficient to warrant a reasonably prudent person to believe that the defendant had committed a crime.

At the time of arrest, the following facts were known.  A shooting had occurred at a mall located at Lawrence and Kimball.  Several suspects had fled the scene, some in a red and black Geo Tracker with a license plate number RASEC 44, some southbound on foot.  Officer Allen, who was working a foot beat nearby, at the time of the crime, heard what could have been a gunshot.  He walked toward Lawrence and Kimball and saw two youths running quickly, southbound from the scene of the crime. One youth was in front of the other.  He observed a gun drop and the second youth picked it up and continued to run.  He called in a flash message and described the two youths as Latinos.  He also described their clothing, noting that they were approximately 18 to 19 years of age, slightly built, one taller, one smaller.  Furthermore, he told the direction in which they were fleeing and that one had a black shirt and one had a red shirt.  Shortly after hearing Officer Allen's message, Officers Schwieger and Valenzano, who were on patrol, headed toward the general area.  When they got to the area of St. Louis and Leland, approximately one block west of the location given by Officer Allen, they saw two subjects who fit the clothing description in the flash message.  The police identified themselves and the red-shirted individual, codefendant Francis Calvadores, stopped.  The black-shirted individual ran and was chased by Officer Valenzano, who observed the individual's face as he looked back during the chase.  Officer Schwieger found a .380 semi-automatic pistol, consistent with the weapon observed by Officer Allen, in Calvadores' left pants pocket.  Another officer later radioed in that a .380 casing was found at the scene of the crime.  When Officer Schwieger radioed in, he included a statement that a short male Hispanic was being chased by his partner.  Officer Valenzano was unable to catch the defendant, but had gotten a better look at him than Officer Schwieger.  Officer Valenzano immediately corrected the radio description previously given over the air by both Allen and Schwieger from Hispanic to Oriental.  The youth was also described as of short stature.  Calvadores subsequently stated that he was not the shooter, but knew the shooter and could take the officers to where the shooter would be.  He then took them to two locations before taking them to the third location, where he and defendant had been earlier, namely 3349 West Sunnyside, Chicago, Illinois, particularly the second floor.  While proceeding to that address, the officers monitored a call from Officer Jaks, who had received information from people at the scene of the crime that several Asian males were seen running from the scene and hopping into a red and black Geo Tracker with a license plate number of RASEC 44.  The officers observed the vehicle when they arrived at the address 
to which the codefendant had taken them.
(footnote: 1)  They knocked on the door to the apartment.  After 5 to 10 minutes of waiting, during which time they heard movement inside the apartment, the officers were let in.  Several young Asian males were inside the apartment, including defendant.  Defendant was arrested, as were the other young Asian men in the apartment.

At the hearing on the motion to quash arrest, Office Schwieger testified that when he and his partner, Officer Valenzano, entered the apartment and saw the defendant, Valenzano indicated to Schwieger that defendant was the individual that Valenzano had been chasing in the alley.  At trial, Officer Valenzano testified that he recognized the defendant as the person he saw fleeing from him, but that he did not say anything to his partner; he instead did say "that's him, let's just take them out of here."  The discrepancy between whether Valenzano spoke directly to his partner or generally out loud is not critical - both officers testified that Valenzano identified defendant at the time of the arrest.  Although the standard for determining whether probable cause existed for a warrantless arrest requires more than mere suspicion on the part of the police officers, it does not require the arresting officers to have in their hands evidence sufficient to convict the defendant.
 People v. Kidd
, 175 Ill. 2d 1, 22, 675 N.E.2d 910, 921 (1996); 
People v. Moody
, 94 Ill. 2d 1, 445 N.E.2d 275 (1983).  We conclude that the trial court correctly determined that probable cause to arrest existed and properly denied defendant's motion to quash arrest and suppress evidence.

The next argument raised by defendant is that the evidence was not sufficient to prove him guilty of murder beyond a reasonable doubt.  When considering such a challenge, a reviewing court views the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. 
People v. Young
, 128 Ill. 2d 1, 538 N.E.2d 461 (1989).

Defendant alleges that compelling evidence of his misidentification mandates conviction vacation.  The jury here heard the evidence regarding the offense, heard about the witnesses' opportunities to view the defendant, including Officer Valenzano's opportunity to view him during the foot chase.  The jury also heard testimony regarding the lineup and photo identifications of the defendant just hours after the offense.  Determining the credibility of witnesses and the weight to be given to their testimony is a function reserved for the trier of fact (
People v. Locascio
, 106 Ill. 2d 529, 478 N.E.2d 1358 (1985)) and a reviewing court must not substitute its judgment for that of the trier of fact, who heard the evidence presented and had the opportunity to observe the demeanor of the witnesses. 
People v. Novotny
, 41 Ill. 2d 401, 412, 244 N.E.2d 182 (1968).  Moreover, it is well settled that even a single witness' testimony is sufficient to sustain a conviction if the witness viewed the accused under conditions permitting a positive identification to be made.  
People v. Slim
, 127 Ill. 2d 302, 307, 537 N.E.2d 317, 319 (1989)
.

In assessing identification testimony, Illinois courts have generally used the steps set out by the United States Supreme Court in the case of 
Neil v. Biggers
, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972) (see, 
e.g.
,
 People v. Simpson
, 172 Ill. 2d 117, 141, 665 N.E.2d 1228, 1240 (1996)).  In that case, the court held that the circumstances to be considered in evaluating an identification include: (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. 
Neil v. Biggers
, 409 U.S. at 199-200, 93 S. Ct. at 382, 34 L. Ed. 2d at 411. 

Here, all five factors are met with respect to the identification of the defendant as the person who committed the crime by at least two of the State's witnesses, Sandy Som and Donald Morgan.  Sandy Som had an adequate opportunity to view the defendant.  It was daylight, defendant threw a punch at him, and Som struck back.  Defendant was only 30 away from Som when he saw defendant shoot the victim.  Donald Morgan, who was driving by the scene of the crime at the time it occurred, also had an adequate opportunity to view the defendant.  He was 10 feet away and observed the crime taking place for approximately two minutes including the beating, the shooting and the defendant fleeing the scene with another individual.  Both witnesses had a high degree of attention and were able to provide additional consistent information regarding the crime, both had given accurate and consistent descriptions of the defendant prior to trial, and there was no uncertainty whatsoever in their descriptions.  Finally, the identifications of defendant by Som and Morgan were made shortly after the crime, five hours and seven hours later, respectively.  Moreover, these identifications were made despite the fact that defendant had changed clothes.

 In addition to these witnesses, Officer Valenzano's identification testimony was credible.  He had an adequate opportunity to view the defendant as he chased him because defendant looked back several times while he was fleeing.  Officer Valenzano, immediately after the chase, was able to correct the radio description of the defendant, previously given as Latino, to Oriental.

Defendant offers as additional compelling evidence of his misidentification the fact that Officer Valenzano did not include any information as to facial or other physical characteristics in his initial description of the individual that he chased.  We first note that our supreme court has stated that any "omissions as to facial and other physical characteristics are not fatal, but simply affect the weight to be given the identification testimony." 
Slim
, 127 Ill. 2d at 308, 537 N.E.2d at 319.  And while it is true that Officer Valenzano did not include any description as to facial characteristics in his corrected description of the defendant,"[i]t has consistently been held that a witness is not expected or required to distinguish individual and separate features of a suspect in making an identification.  Instead, a witness' positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made." 
People v. Slim
, 127 Ill. 2d at 308-09, 537 N.E.2d at 320.  While defendant has not identified any unique or distinguishable facial characteristics which should or even could have been included in Officer Valenzano's description, such as the presence of facial hair, tattoos, scars, other marks, braces, missing teeth, etc., he boldly contends that Officer Valenzano lied about seeing his face because no facial characteristics were included in Officer Valenzano's description.  Defendant has failed to support this specific argument with any relevant case law.  Nevertheless, this court's independent research has disclosed two cases that addressed this issue.  These cases have noted that this lack of detail in a description is particularly insignificant, where, as here, the defendant has no abnormal or distinguishing features.  
People v. Harrell
, 104 Ill. App. 3d 138, 432 N.E.2d 1163 (1982); 
People v. Hemphill
, 62 Ill. App. 3d 977, 379 N.E.2d 1284 (1978).

Defendant also contends that discrepancies existed in the testimony that would raise a reasonable doubt as to his guilt.  Nonetheless, "when the determination of a defendant's guilt or innocence depends upon the credibility of the witnesses and the weight to be given their testimony, it is for the trier of fact to resolve any conflicts in the evidence."  
People v. Rush
, 294 Ill. App. 3d 334, 337, 689 N.E.2d 669, 672 (1998).

Prior to trial, defendant filed a motion 
in
 
limine
 seeking to preclude the State from introducing any evidence regarding gang affiliation.  The motion was denied by the court, which determined that the evidence was relevant and that its probative value outweighed any prejudice to the defendant.  We agree.

"Evidence of gang membership, like other evidence, is admissible if relevant to an issue in dispute, and its probative value is not substantially outweighed by its prejudicial impact." 
People v. Rodriguez
, 291 Ill. App. 3d 55, 64-65, 684 N.E.2d 128, 134 (1997), citing 
People v. Johnson
, 159 Ill. 2d 97, 118, 636 N.E.2d 485 (1994).  In the instant case, there was no evidence that defendant and the Korean victim had any prior relationship.  Immediately prior to the fight, however, defendant, a member of a Filipino street gang, yelled "RSG" and "Dragon Killer" at the victim.  These were references to a Korean gang.  Thus, the evidence of gang affiliation was relevant to explain the motive for the murder, which was gang rivalry.  The additional evidence regarding the cigarette burn marks on the hands of the defense witnesses was also relevant in that it illustrated the common bound between the witnesses and the defendant, who were all members of the Filipino street gang "Red Scorpions," and was relevant to show the defense witnesses' motive to testify as they did.

With respect to defendant's argument that the State injected a race issue into the case to inflame juror passions, we disagree.  True, the State commented on the Filipino nationality and the fact that it is comprised of a combination of Oriental and Latino influences.  The argument, however, was proper.  It was invited in response to defense counsel's closing argument, which emphasized the discrepancy between the initial characterization of the offenders as Latino and the later characterization as Oriental.  As such, we find inapposite those cases cited by defendant that dealt with racially biased arguments, appeals to racial passion or "gratuitous" references to race, where race had 
nothing
 to do with the issues.  None of these situations was present in the instant case.

Finally, defendant contends that his 40-year sentence was excessive in light of his young age, his lack of criminal history and his potential for rehabilitation.  The imposition of a sentence is a matter of the trial court's discretion.  See 
People v.
 
Jones
, 168 Ill. 2d 367, 659 N.E.2d 130 (1995).  Absent a trial court's abuse of discretion, this court will not vacate or reduce a sentence if it falls within the statutory limit. 
Jones
, 168 Ill. 2d at 373, 659 N.E.2d at 1308.  This is so, because the weight that the trial judge accords each factor in aggravation and mitigation, and the resulting balance that is struck among them, depends on the circumstances of the case. 
People v. Grisset
, 288 Ill. App. 3d 620, 635-36, 681 N.E.2d 1010, 1021 (1997).

Although Supreme Court Rule 615(b)(4) gives reviewing courts the power to reduce a sentence, the trial court's decision is nevertheless given deference because of the trial court's unique ability to consider the many factors from which an appropriate sentence can be derived which is superior to the cold record on appeal. 
People v. Perruquet
, 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884 (1977).  Here, the trial court explained that it had considered the arguments of very able counsel in both mitigation and aggravation, the testimony of the defendant, all 16 letters in mitigation submitted on behalf of the defendant, the testimony of the defendant's mother, the victim impact statements, the testimony of the victim's sister, and the presentence investigation report.  The court indicated that it was well aware of defendant's age and his lack of prior criminality.  The court considered defendant's potential for rehabilitation.  The court found defendant to be a particularly intelligent young man who has enjoyed the benefit of a caring and loving family.  The court also considered the evidence in this case very well and was aware of defendant's gang activity.  The sentence imposed by the trial court incorporated and was predicated upon all of those factors, but particularly the defendant's potential for rehabilitation.  Furthermore, in imposing the sentence, the trial judge noted that this case clearly demonstrated that it was another illustration of senseless gang violence.  Nevertheless, the court also stated that the sentence would give the defendant the opportunity to pursue his education while incarcerated so that those were not wasted years.  We conclude that defendant's 40-year sentence was within the statutory sentencing range of 20 to 60 years for first-degree murder and was not an abuse of discretion.

For the foregoing reasons, we affirm the defendant's conviction of first degree murder and the 40-year sentence imposed by the trial court.

Affirmed.

BUCKLEY, P.J. and O'BRIEN, J. concur.

FOOTNOTES
1:
Defendant's characterization of the subsequent warrantless arrest and search of the premises as an "investigatory sweep" is totally devoid of merit rendering irrelevant his citation to cases involving such sweeps.