THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEMOND WESTON *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 1—92—2069, 1—92—2076, 1—92—3449, 1—92—3983 cons.

■■■■■■■■

Opinion filed March 31, 1995.

Rita A. Fry, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellants Demond Weston and Jerrod Smith.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant John Walker.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Sari London, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

In this consolidated appeal, defendants Demond Weston, Jerrod Smith, and John Walker (collectively defendants) were charged with a number of crimes resulting from two separate, but gang-related shootings on May 29, 1990. After a jury trial, Weston was found guilty of first degree murder and attempt to commit first degree murder. Subsequently, Smith and Walker were tried simultaneously in a severed bench trial. The circuit court found Smith and Walker guilty of attempt to commit first degree murder. Defendants appeal their convictions and sentences.

In order to comply with recently adopted page limitations set forth in Supreme Court Administrative Rule MR No. 10343, which accompanied amended Supreme Court Rule 23 (Official Reports Advance Sheet No. 15 (July 20, 1994), R. 23, eff. July 1, 1994), the written disposition in this appeal will be bifurcated into this opinion, to be published, and an unpublished Rule 23 order disposing of the remaining, nonprecedential issues, filed contemporaneously with this opinion.

The following issues are presented in these appeals; their dispositions, whether by this opinion or by Rule 23 order (Rule 23), are designated in parenthesis. We are asked to review whether the circuit

court erred (1) in denying Weston's motion to quash arrest and suppress evidence (opinion); (2) in joining two indictments in the Weston trial (opinion); (3) in allowing hearsay testimony during the Weston trial (Rule 23); (4) in permitting improper comments by the State during closing argument in the Weston trial (Rule 23); (5) in denying defendants' challenge to the State's substitution of judge practice (opinion); (6) in weighing the evidence by a clear and convincing standard during the trial of Smith and Walker (opinion); and (7) in imposing upon defendants excessive sentences (Rule 23).

On August 27, 1991, the circuit court heard Weston's motion to quash arrest and suppress evidence. Weston testified that on June 9, 1990, he was at 5926 S. Union around noon when four plainclothes police officers approached him, searched him, released him, but later returned and, without an arrest warrant, handcuffed Weston and took him to the police station. Weston gave a written statement, although he testified that he was not first advised of his *Miranda* rights, and was placed in a lineup on July 17, 1990.

Detective Michael Kill testified that on June 9, 1990, he was working on the investigation of three shootings that occurred on the evening of May 29, 1990, in which one person died and six others were injured. After talking to a witness to another homicide case, in which it was believed the same 9 millimeter semi-automatic pistol was used as in the instant shootings, Kill arrested Duane Macklin at 5928 S. Union. Prior to the arrest, Kill questioned Macklin regarding the 9 millimeter pistol and recovered it from a car parked in a lot nearby.

At the police station, Macklin told Detective Kill that in the evening of May 29, 1990, he and other Gangster Disciples met to discuss a problem they were having with another gang, the Conservative Vice Lords. The 9 millimeter pistol that was recovered by Kill and other firearms were brought to the meeting. Ten Gangster Disciples then left to "go on a mission." Macklin identified six individuals, including "Demond."

The day after the meeting, two of the gang participants took Macklin on a tour of the area of 5700 S. Wolcott and 5500 S. Justine, where the shootings took place. At approximately 3:30 p.m. on June 9, Detective Kill and two other detectives took Macklin to the area where he was arrested to identify some of the participants in the shootings. Macklin identified "Demond," who was standing in front of 5926 S. Union wearing a black cap and a black jacket. Kill handcuffed Demond Weston, placed him under arrest, and drove him to the police station. Kill placed Weston in an office, removed the handcuffs, and read him his *Miranda* rights, which took about five minutes.

On cross-examination, Detective Kill testified that during the interrogation, Macklin was under arrest for an unrelated murder, not for the shootings in this case.

The circuit court found that Macklin, who was in custody at the police station, had nothing to gain by fabricating his story to Detective Kill. Considering the totality of the circumstances, the court found that there was probable cause to arrest Weston and denied his motion to quash the arrest.

At trial, the evidence established that on May 29, 1990, defendants Weston, Smith and Walker, along with other Gangster Disciples, organized a "wrecking crew" and shot at people in three separate locations, each only three blocks from one another. The first location was 57th and Wolcott, where Joseph Watson was shot and killed, and Timothy Jones was shot. The second location was 5759 S. Honore, where Pierre Solomon, J.D. Lee and Derrick Mason were shot. This incident was not the subject of an indictment. The third location, 5530 S. Justine, was where Deneen Coats and Ronald Nesbit were shot.

Timothy Jones, age 15, testified that on May 29, 1990, at approximately 10:30 p.m., while riding his bicycle on the 5600 block of Wolcott, he saw Joseph Watson across the street. Three boys came out of the gangway and started shooting. It was dark, and although Timothy could not see the boys' faces, he observed that they were wearing dark clothes. Timothy was shot in the legs three times, but managed to get home by jumping a gate and running through an alley. As he was running, he heard about four more shots. Timothy did not see Joseph Watson get shot.

Antonio Harris testified that on May 29, 1990, he was standing on the front porch of his home at 5643 S. Wolcott, saw Timothy Jones ride by on a bicycle, and then saw someone shoot Timothy. When bullets flew through his porch window, Antonio ran into his house. As he crouched down and looked out the glass door, he saw three men chasing and shooting someone else; another person trailed the three in pursuit. The victim was shot once and hollered "you already shot me," but the shooting continued. Antonio did not see the faces of the shooters, but noticed that they were wearing black. At the time of his testimony, Antonio was on parole for aggravated criminal sexual assault.

Pierre Solomon testified that on the evening in question, he was with his friends J.D. Lee and Derrick Mason. Pierre belonged to the gang Black P. Stone, and J.D. and Derrick were Vice Lords. These two gangs were in the gang alliance "Brothers," and the enemy organization was the "Folks," of which the Gangster Disciples were a

member. They were sitting on the porch steps at 5759 S. Honore talking when he saw six to eight men, dressed in black with their hats pulled way down, across the street; he could not see their faces. One of the men fired his gun, and Pierre and his friends ran inside the home. He stated that at least two guns were being fired at them. Pierre was shot in both thighs, J.D. was shot in his right arm, and Derrick was shot in the hip and arm.

Deneen Coats testified that on the night of May 29, 1990, while sitting on the porch of her home at 5530 S. Justine with her friends Ronald Nesbit and Reginald Norwood, she noticed a group of about eight men, wearing dark clothes and caps, standing across the street. They pushed around a friend of hers, and then they walked to the middle of the street, stopped in front of her house, pulled out their guns, and started shooting at her. The street was well-lit, and Deneen was able to see the faces of the shooters. As she and her friends ran inside her home, she was shot once in the upper leg and again in the back, the second shot piercing her lung. Ronald Nesbit was shot in the foot.

Deneen viewed a lineup at the police station and identified defendants Weston, Smith, and Walker as some of the men that shot at her that evening.

Detective William Moser testified that after defendant Weston was arrested, he was advised of his *Miranda* rights. He and Detective Tony Maslanka then questioned Weston about the shooting at 57th and Wolcott. Weston told them that on the evening of May 29, he, Duane Macklin, and Cortez Brown were approached by fellow Gangster Disciples, who said they were organizing a "crew" to take care of a problem with some Vice Lords. They agreed to join. Macklin handed Brown a large automatic pistol; Weston had a .22-caliber pistol in his pocket. Around 9 p.m., Weston and Brown met with four or five Gangster Disciples at 57th and Winchester. They walked north on Wolcott, where they saw members of the Vice Lords. They began firing at the Vice Lords and chased after them. Weston ran up to a fallen Vice Lord, who lay on the corner of 57th and Wolcott. The Vice Lord screamed not to shoot, but Weston pulled out his revolver and fired two shots at him as he lay on the ground.

Thereafter, Assistant State's Attorney Paul Sabin arrived to speak to Weston. Sabin advised Weston of his *Miranda* rights, and Weston agreed to give a court-reporter statement. The statement, published to the jury, is similar to Detective Moser's testimony, with the following exceptions: the purpose of the mission was to "scare" the Vice Lords, or to "shoot in the air to chase them back"; and when the Vice Lord was lying on the ground, Weston aimed and shot his gun "way over" the Vice Lord's head, and denied shooting anybody.

Ernest Warner, a police firearms examiner, received from the medical examiner's office the fired bullet from the body of Joseph Watson, the murder victim. In Warner's opinion, it was a ".22 caliber fired bullet." Medical examiner Dr. Nancy Jones was of the opinion that Watson died as a result of multiple gunshot wounds.

Weston testified that he did not participate in any of the shootings. When Detectives Moser and Maslanka questioned him at the police station, they called him a liar when he denied any knowledge of the shootings, and Moser slapped him about 10 times. After a couple of hours of this interrogation, Weston became scared and tired of the abuse and agreed to tell them whatever they wanted. He stated that his court-reporter statement was not the truth.

Following closing arguments, the jury found Weston guilty of the murder of Joseph Watson, and the attempted murders of Deneen Coats, Ronald Nesbit, and Timothy Jones. On May 18, 1992, the circuit court denied Weston's motion in arrest of judgment and motion for a new trial. The court, after hearing arguments in aggravation and mitigation, sentenced Weston to 45 years in custody of the Illinois Department of Corrections for the murder of Joseph Watson and a concurrent term of 30 years for the attempted murder of Timothy Jones. Weston was also sentenced to 30 years each for the attempted murders of Deneen Coats and Ronald Nesbit, to run concurrently. Based on the brutality of the crimes and Weston's dangerous nature, the court ordered the 45- and 30-year sentences to run consecutively.

Defendants Walker and Smith were tried in a severed bench trial that was heard simultaneously. The State presented the live testimony of Deneen Coats, who testified substantially the same as she did in Weston's trial. The remaining evidence was presented by stipulating to the evidence presented at Weston's trial. The circuit court sustained Walker and Smith's motion for a finding as to all charges stemming from the shootings of Joseph Watson and Timothy Jones. After closing arguments, the court found Walker and Smith guilty of attempted first degree murder of Deneen Coats and not guilty of the remaining charges. On August 31, 1992, the circuit court denied Walker and Smith's motions for a new trial and, after hearing arguments in aggravation and mitigation, sentenced Walker and Smith each to 25 years in custody of the Illinois Department of Corrections.

All defendants filed timely notices of appeal.

# I

Weston's first contention is that the police lacked probable cause

to arrest him because Duane Macklin's status as a suspect rendered his information unreliable.

A police officer's knowledge of probable cause may be based on an informant's tip and, if the facts supplied in such a tip are essential to a finding of probable cause, the tip must be reliable. (*People v. Tisler* (1984), 103 Ill. 2d 226, 237, 469 N.E.2d 147.) One indicia of reliability of information is found in admissions against the penal interests of the party giving the information. (*People v. James* (1987), 118 Ill. 2d 214, 223, 514 N.E.2d 998.) The tip is deemed especially reliable where the information supplied by the informant admits his own involvement in the crime and the record shows that he was offered no inducement or "deal" for identifying his accomplices. (*James*, 118 Ill. 2d at 224.) Although the testimony of an accomplice may be suspect because of the motivation to shift the blame to others, the danger of fabrication in a probable cause setting is less than at the trial stage. (*James*, 118 Ill. 2d at 224.) Another indicia of reliability exists when facts learned through police investigation independently verify a substantial part of the informant's tip. *James*, 118 Ill. 2d at 225.

■ Here, the informant Duane Macklin was under arrest for another murder at the time he told Detective Kill that Weston was a participant in the shootings in this case. Although Macklin was not under arrest for the instant shootings, the information he supplied implicated him in the commission of the crimes. Specifically, he told Kill that he was present at the Gangster Disciples' meeting, where they organized the wrecking crew and set out on their mission. He also provided a fellow gang member the 9 millimeter pistol that was believed to be used in the instant shootings.

The information that Macklin gave could have been considered reliable by the circuit court because it "admitted his own involvement in the crimes, something which common sense indicates one does not do lightly or falsely." (*James*, 118 Ill. 2d at 224.) Moreover, nothing in the record suggests that Macklin was given a "deal" for identifying his accomplices. Because he probably knew that he would remain in custody whether or not he supplied the information, he had nothing to gain by providing a false tip to the police. Indeed, "a person 'who knows the police are in a position to charge him with a serious crime will not lightly undertake to direct the police down blind alleys. [Citation.]' " *James*, 118 Ill. 2d at 224.

The reliability of Macklin's accusation of Weston is further supported by the independent verification of a substantial part of his statement by the facts learned through police investigation. The police had found 9 millimeter cartridge cases at the various locations of the May 29 shootings, which corroborated Macklin's confession that

he gave a 9 millimeter pistol to a Gangster Disciple prior to the "mission." Police knowledge of the locations of the crimes also matched the information Macklin supplied regarding his tour of the shooting areas, given by his fellow gang members on May 30, 1990. Although there was no independent verification that Weston was involved in the shootings, the verified portion of Macklin's story lends credence to the remaining unverified portion. See *James*, 118 Ill. 2d at 225.

Macklin's tip possessed sufficient indicia of reliability; the circuit court's findings as to probable cause were not manifestly erroneous.

## II

Weston next argues that the circuit court erred in granting the State's motion to join two indictments and in allowing the introduction of evidence of an uncharged shooting at trial.

Weston was charged with two separate indictments in this case. Indictment No. 90—CR—16376 charged Weston with the murder of Joseph Watson, attempted murder of Timothy Jones and other related charges. Indictment No. 91—CR—640 charged Weston with the attempted murders of Deneen Coats and Ronald Nesbit and other related charges. Weston was not charged in the shooting of Pierre Solomon, J.D. Lee, and Derrick Mason.

A court may order two or more charges to be tried together if the offenses charged are based on two or more acts which are part of the same comprehensive transaction. (Ill. Rev. Stat. 1989, ch. 38, pars. 111—4(a), 114—7 (now 725 ILCS 5/111—4(a), 5/114—7 (West 1992)).) The general test of the appropriateness of joinder is whether the offenses were of a similar nature or were part of a single transaction or common scheme. (*People v. Harmon* (1990), 194 Ill. App. 3d 135, 139, 550 N.E.2d 1140.) The most important factors to consider are the proximity in time and location of the offenses and any common evidence with respect to the offenses. (*Harmon*, 194 Ill. App. 3d at 139-40.) The circuit court has substantial discretion in deciding whether to sever separate charges, and its decision will not be reversed absent an abuse of discretion. *Harmon*, 194 Ill. App. 3d at 140.

■ In the present case, the offenses from the two indictments arose from the same comprehensive transaction. The locations of the three May 29 shootings were within three blocks of each other. They occurred around 10:30 p.m.; and the motive for the shootings was the same, to get revenge on rival gang members for shooting the windows of defendant Walker's car, although some nongang members were also shot. There was also common design, method, and evidence. A 9 millimeter gun was used at each shooting. The victims were shot while they were engaged in nonviolent activity; while they were

outside, often at their homes; and at each shooting, as the victims tried to escape, the defendants continued shooting. The circuit court did not abuse its discretion in trying the two indictments together.

The circuit court also did not err in admitting the evidence of the uncharged shooting. Testimony relating other crimes committed by the accused may be introduced at trial if the evidence is offered for a purpose other than to establish his or her propensity to commit crime and where the probative value of the evidence outweighs the risk of unfair prejudice. (*People v. Maxwell* (1992), 148 Ill. 2d 116, 130, 592 N.E.2d 960.) Other-crimes evidence is admissible to prove *modus operandi*, intent, identity, motive, or absence of mistake. (*People v. Hayes* (1990), 139 Ill. 2d 89, 145, 564 N.E.2d 803.) The prejudicial effect of other-crimes evidence is limited when the circuit court instructs the jury that it is to be received for a limited purpose (*People v. Evans* (1988), 125 Ill. 2d 50, 83, 530 N.E.2d 1360), and its admission will be upheld on appeal unless it represents an abuse of discretion. *Maxwell*, 148 Ill. 2d at 130.

■ Here, the evidence of the uncharged shooting was relevant to establish *modus operandi*. At the location of the first shooting, 57th and Wolcott, the witnesses testified that there were three or four people shooting. Police testified that 9 millimeter cartridge cases were found there. At the location of the third shooting, 5530 S. Justine, the witnesses stated that there were between 5 and 10 shooters, and the police recovered a 9 millimeter cartridge case. At the uncharged shooting on 5759 S. Honore, one victim stated that there were between six and eight men, and again, 9 millimeter cartridge cases were found at the scene.

The uncharged shooting clearly is closely intertwined with the two charged shootings and is relevant to showing the common scheme or design of the crimes. The prejudicial effect was limited by the circuit court's instruction to the jury that it was to be considered only for the limited purpose for which it was received. The court did not abuse its discretion in admitting evidence of the uncharged shooting.

## III

Defendants Weston, Smith, and Walker contend that the circuit court erred in denying their challenge to the State's misuse of substitution of judge (SOJ) motions under *People ex rel. Baricevic v. Wharton* (1990), 136 Ill. 2d 423, 556 N.E.2d 253. In particular, defendants maintain that the State systematically used the SOJ motion under section 114—5(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 114—5(c) (now 725 ILCS 5/114—

5(c) (West 1992))), to remove Judge Donald E. Joyce from murder and Class X felony cases. They claim this practice interferes with the independence of the chief judge's assignment power and therefore violates the separation of powers clause of the Illinois Constitution (Ill. Const. 1970, art. II, § 1). Defendants request that the decision of the circuit court be reversed and remanded for a *Wharton* hearing to determine whether the case should be reassigned to Judge Joyce for a new trial.

■ A case may become moot when, pending the decision on appeal, events occur which render it impossible for the reviewing court to grant effective relief to either party. (*Hess v. I.R.E. Real Estate Income Fund, Ltd.* (1993), 255 Ill. App. 3d 790, 799, 629 N.E.2d 520.) Illinois courts do not issue advisory opinions and will not resolve questions merely for the sake of setting precedent to govern potential future cases. (*Hess,* 255 Ill. App. 3d at 799.) That is precisely the case here. The State correctly asserts that Judge Joyce is now retired. By virtue of the retirement, the State can no longer engage in the practice of removing Judge Joyce from certain criminal cases, nor can defendants have a retrial before Judge Joyce. It is therefore impossible for defendants to obtain the relief they ultimately seek, a retrial before Judge Joyce. Furthermore, the record amply demonstrates that defendants received a fair and impartial trial before Judge Edward M. Fiala. It would be a fruitless exercise to retry the case before another judge when defendants have already received such a trial.

This issue is moot.

IV

Defendants Smith and Walker next argue that the circuit court erred in weighing the evidence by a "clear and convincing" standard, instead of holding the State to its burden of proof of guilt beyond a reasonable doubt.

In this case, the circuit court stated, after hearing all the evidence and closing arguments:

"I've had the benefit of listening to the arguments of very able counsel and especially listening to the testimony of Dineen Coates [*sic*].

I had an opportunity to observe her while testifying here. I considered her manner while testify [*sic*]. I've considered her opportunity to make her observations that she testified to, her position at the time that she testified as to making those observations.

I've considered the artificial lighting, both the streetlight and house lights from her home that did illuminate the street in question.

I've reflected carefully upon the stipulations entered into by and between counsel, and I've reviewed and examined the People's exhibits offered and accepted into evidence.

My findings are based upon the totality of all of those factors. I find Miss Coates [*sic*] to be an exceptionally able witness, in that she had an ability to recall detail. I found her to be a very intelligent witness, and I found her—I found her testimony clear and convincing and, accordingly, I do find Johnnie Walker guilty of attempt first degree murder of Miss Coates [*sic*]. I find him not guilty of the rest of the counts.

I find the defendant, Jerrod Smith, guilty of attempt first degree murder of Dineen Coates [*sic*], and I find him not guilty of the remaining counts. Judgment is entered upon each of my findings."

Due process requires that a defendant be proven guilty beyond a reasonable doubt before being punished for a crime. (*In re Winship* (1970), 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1072-73; *People v. Lambert* (1984), 104 Ill. 2d 375, 380-81, 472 N.E.2d 427.) Although the circuit court is presumed to know the law and apply it properly, when the record affirmatively shows the contrary, that presumption is rebutted. (*People v. Virella* (1993), 256 Ill. App. 3d 635, 638, 628 N.E.2d 268.) The court is not required to state for the record the standard of proof it has employed. (*People v. Gutierrez* (1982), 105 Ill. App. 3d 1059, 1063, 433 N.E.2d 361.) The clear and convincing standard of evidence is less than that of proof beyond a reasonable doubt. *Virella*, 256 Ill. App. 3d at 638.

In *Virella*, this court held that the circuit court applied the wrong burden of proof in finding defendants guilty. In that case, however, the circuit judge repeatedly proclaimed that the "totality" of the State's evidence was clear and convincing. In all, the court referred to the clear and convincing standard of proof four times. This court concluded that such reference was strong affirmative evidence that the circuit court applied the wrong standard of proof in adjudging defendants guilty.

■ Here, the circuit judge stated in pertinent part: "I found [Coats'] testimony clear and convincing and, accordingly, I do find Johnnie Walker guilty of attempt first degree murder ***." This statement is not in the same category as those made in *Virella*. The circuit judge here never said that the *totality* of the State's evidence was clear and convincing; only Coats' testimony was clear and convincing. Although Smith and Walker claim that only Coats' testimony persuaded the court to find them guilty, the record demonstrates otherwise. The court's statements were not only that it considered Coats' testimony, but also the attorneys' stipulations,

which included the testimony from the Weston trial; the State's exhibits; and that its "findings are based on the totality of all those factors." Smith and Walker's contention is without merit.

The decision of the circuit court will not be reversed based on an isolated statement. The burden of proof, beyond a reasonable doubt, is one of the most basic tenets in criminal law, known to laymen, lawyers and judges alike. The presumption that the circuit court knows the law is not so easily rebutted in this case by one isolated statement, especially where the court demonstrated excellent knowledge of law and facts throughout the trial. Smith and Walker simply have not produced the strong affirmative evidence needed to rebut the presumption that was shown in *Virella*. The circuit court's use of the term of art "clear and convincing" was used solely to assess the credibility of Coats.

There was no error in the circuit court's adjudgment of Smith and Walker as guilty.

For the reasons set forth above, defendants' convictions must be affirmed.

Affirmed.

DiVITO and McCORMICK, JJ., concur.