THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELLIS PATTERSON, Defendant-Appellant.

First District (2nd Division)    No. 1—94—3363

Opinion filed June 28, 1996.

Arnstein & Lehr, of Chicago (Patrick A. Tuite, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

On February 28, 1992, Chicago fireman Woody Woods was shot and killed as he sat in his truck parked at an outdoor bank automated teller machine. Defendant, Ellis Patterson, was indicted for Woods' murder in the first degree. Following a jury trial, defendant was convicted and sentenced to 40 years in prison. He appeals, raising as

issues for review whether (1) the circuit court erred in denying his motion to quash arrest and suppress statements; (2) his conviction was based upon inadmissible hearsay; (3) the State improperly cross-examined a witness regarding an inculpatory statement without providing notice during discovery of the statement's existence; (4) the State failed to perfect impeachment on a noncollateral matter; and (5) the State improperly used defendant's silence following arrest against him in violation of *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). For reasons which follow, we affirm.

Defendant filed a motion to quash arrest. At the hearing on the motion, defendant testified that on October 15, 1992, he was 15 years old, a sophomore at Corliss High School, and lived with his aunt, Gloria Jackson, at 121st and South Michigan. He was in school when Chicago police officers handcuffed him and took him to a police station, where he was handcuffed to a bench. The police officers did not inform him they had a warrant for his arrest. He did not talk to any adult family members at the police station. On cross-examination, defendant acknowledged he was wearing a beeper in violation of law and that he had been arrested previously in school for wearing a beeper. See Ill. Rev. Stat. 1989, ch. 122, par. 10—21.10 (now 105 ILCS 5/10—21.10 (West 1994)).

Chicago police detective Anthony Lowery testified at the quash arrest motion hearing that on October 15, 1992, he went to Corliss High School and arrested defendant, believed to have been involved in a homicide at 1000 East 111th Street. He did not have an arrest warrant nor did he know of any outstanding warrants for his arrest. Prior to the arrest, Lowery and his partner met with a confidential informant (later identified as defendant's uncle), who told the detectives of a conversation the informant overheard between defendant and Freddie Jackson, Jr. (later revealed as another of the informant's nephews), in which the two discussed how defendant had shot the victim in the bank parking lot. The two were concerned because the weapon used in the shooting had been recovered subsequently from Jackson, Jr., by the police. The informant told the detectives the approximate ages of the two as well as their addresses.

Detective Lowery possessed other information prior to arrest indicating that the offenders were African-American males who were in their teens or early twenties. Lowery confirmed that Jackson, Jr., an African-American male in his early twenties, recently had been arrested on a gun charge and a weapon had been recovered from him. Lowery verified that the addresses given by the informant were correct and that defendant was an African-American male teenager. Lowery also discovered that defendant and Jackson, Jr., had given

the same home address on a previous arrest. The lab results indicated a strong probability that the weapon recovered from Jackson, Jr., was used in the February 28, 1992, shooting; it had the same characteristics as the bullet recovered from the victim. Only two weapons manufacturers in the United States make handguns with the characteristics possessed by the weapon involved here. Lowery could not confirm, however, whether the weapon recovered from Jackson, Jr., was the same one used in the February 28, 1992, shooting.

Defendant's motion to quash the arrest was denied, the circuit court finding that the detectives had corroborated sufficiently the informant's statements.[1]

At trial, evidence was adduced from which the jury could believe the following information.

On February 28, 1992, at 9:45 p.m. the body of the victim was found in the driver's seat of his red truck, parked at a Heritage Pullman Bank automated teller machine located at 111th Street and the Calumet Expressway. The driver's side window was shattered. An autopsy revealed that the victim died of multiple gunshot wounds, one gunshot wound at the back of his head on the left side and a through-and-through gunshot wound on the back of his left shoulder. There was no evidence of close-range firing.

Chicago police detective John McMurray testified that when he arrived at the scene he found the victim seated in the driver's seat with two payroll checks in his left hand. The victim's right hand held a ballpoint pen and was propped up against the vehicle's gear shift, which was in second gear. A cash station card and a deposit envelope also were present. There was blood on the floor of the truck, but no shells were found inside the truck. Some glass from the driver's side window was located on the ground next to the truck, indicating that the vehicle had not been moved after the shooting. McMurray found the key in the ignition in the "on" position, the radio in the "on" position, and the headlights "on."

John Woodruff and his girlfriend, Ethel Cook, went to the Heritage Pullman Bank at approximately 9:30 p.m. Woodruff noticed three people inside a Blazer or Bronco-type vehicle parked in front of him. He drove around the vehicle to an automated teller machine; after three minutes, he left the area. Ethel Cook saw a dark-colored

---

[1] A separate hearing on defendant's motion to suppress evidence resulted in denial. Defendant's argument on appeal in relation to the motion to suppress evidence arises solely from the arrest; therefore, the validity of the arrest governs the disposition of that issue.

Bronco-type vehicle, without lights, parked near the curb at the Heritage Pullman Bank with three men in it. The people in the truck were between 16 and 17 years of age; one was wearing a Starter jacket and another was wearing a baseball cap.

Dorothy Turner went to an automated teller machine at the Heritage Pullman Bank at 9:35 p.m. and noticed two males sitting in a truck parked at the curb. The driver was wearing a baseball cap and turned his back when she drove past. Turner drove around the truck, proceeded to an automated machine and, after transacting her business, left.

Retired Chicago police detective Michael O'Connor testified that he and his partner, Detective Lowery, spoke with Charles Jackson, one of defendant's uncles, on October 12, 1992. On October 15, 1992, the detectives looked for defendant at his home address. He was not present and they left their card, asking that he call them upon his return. The detectives then went to Corliss High School, where they found defendant and placed him under arrest. Lowery read defendant his *Miranda* rights. They informed him they were investigating the February 28, 1992, shooting at the Heritage Pullman Bank. Defendant then hit his head against the chair and grimaced; he was taken to the police station and placed in an interview room.

Detective O'Connor testified that they were preparing to go to Freddie Jackson, Jr.'s (Jackson, Jr.) home when Freddie Jackson, Sr. (Jackson, Sr.), another of defendant's uncles, telephoned and informed them he was bringing his son to the station. Upon arrival, Jackson, Jr., was taken into an interview room and questioned about the case after being given his *Miranda* warnings. At 4 p.m., Jackson, Sr., again telephoned the station and told the police he was bringing in someone else who would clear up the matter. At 4:30 p.m., Jackson, Sr., brought Bobby Latiker into the station, who was questioned about the homicide in an interview room. After talking to Latiker, O'Connor discussed the shooting with Jackson, Jr., and, thereafter, with defendant.

During this time, defendant was alone in an interview room except for a brief conversation with the detective between 12 p.m. and 2:30 p.m. He was not handcuffed and, after 1 p.m., the door to the room was left open because defendant complained about it being closed. Defendant was offered food and drink and was allowed to use the restroom several times. The detectives spoke with defendant at 5:30 p.m. in the presence of Jackson, Sr., following advice of his *Miranda* rights. After the detective told defendant he had spoken with Latiker and Jackson, Jr., defendant began crying and said, "I didn't mean to kill that man. Shoot me. Shoot me. Kill me. Kill me." This oral statement was not written down by the detectives.

After defendant gave the statement, Jackson, Jr., came into the room to talk to him. Defendant asked to see his aunt, Gloria Jackson (Gloria), who later came to the station. Detective O'Connor then left the room to contact an assistant State's Attorney. On cross-examination, O'Connor testified he had neither fingerprint evidence nor physical descriptions of the offenders. No physical evidence had been gathered between March 1 and October 11, 1992.

Assistant State's Attorney (ASA) Stanislaus Gonsalves testified that he had conversations with Latiker, Jackson, Jr., and defendant. Gonsalves advised defendant of his *Miranda* rights, told him he was an ASA, informed him he did not represent defendant and that, although he was 15 years old, defendant could be tried as an adult. Defendant stated that he understood everything Gonsalves told him. Detectives Lowery and O'Connor, as well as Jackson, Sr., and Dwanda Patterson (Dwanda), defendant's 22 year-old sister, were present.

Defendant agreed to talk. He told ASA Gonsalves that on the night of February 28, 1992, he and Latiker were at Jackson's house, and they left to go to the home of defendant's grandmother. On the way, the vehicle stopped and defendant exited, armed with a handgun he had obtained earlier in the week. Defendant approached a bank, saw a man sitting in a red truck at the cash station, walked toward the driver from the rear with the weapon in his hand and, standing three feet away from the driver, defendant pointed the gun at the man's head and fired once. The driver of the car leaned over. Defendant left the scene. Defendant told Gonsalves that Latiker and Jackson, Jr., did not know what he was going to do, and when he returned to the car, the three boys drove off. Defendant's statement was not then reduced to writing by Gonsalves nor was defendant asked to sign a statement.

ASA Gonsalves left the room to talk to Latiker and Jackson, Jr., in order to resolve some inconsistencies in their statements. After speaking with Latiker and Jackson, Jr., Gonsalves returned to speak with defendant to determine whether he would reduce his statement to writing. When Gonsalves entered the room, Jackson, Sr., and Dwanda informed Gonsalves that defendant did not want to talk and he would not give a written statement.

Gloria, defendant's aunt, testified that two police officers came to her house on October 15, wanting to question defendant about a burglary. At 8:30 p.m., she went to the police station where defendant was being held and there saw her brother, Jackson, Sr., and Dwanda, her niece. She stayed with defendant in an interview room until the police moved him into a lockup at 3 a.m.

On cross-examination, Gloria denied having spoken with Detec-

tives O'Connor and Lowery at the police station or having informed them that over the past month defendant seemed troubled. She also denied defendant told her he had shot someone.

Jackson, Sr., testified that he heard his son was being held by the police. He went alone to the police station at 5 p.m., waited there until 6 p.m. and then departed; returned to the station at 6:45 p.m. and saw his niece, Dwanda, who was there with her boyfriend, Latiker. Jackson, Sr., did not know defendant, his nephew, also was being held at the police station until 8:30 p.m. Jackson, Sr., denied being in an interview room with defendant, two detectives and an assistant State's Attorney; he also denied hearing his nephew make any statements to the assistant State's Attorney. At 10 p.m., ASA Gonsalves told Jackson, Sr., that he was an attorney and he would represent Jackson's son on a burglary charge. Jackson, Sr., denied having telephoned the police station and telling police he would bring in anyone.

Defendant testified. He was arrested on October 15, 1992, and taken to a police station where he was placed in a room. Detectives O'Connor and Lowery were present. They did not talk to each other for 20 minutes. Neither his uncle, Jackson, Sr., nor his sister, Dwanda, was ever present in the room. After an hour, Detective Lowery returned to the room and informed defendant he was being charged with murder. He responded that he did not know what the detective was talking about. This conversation lasted for 35 minutes. After Lowery left the room, defendant's Aunt Gloria entered the room and stayed with him until 3 a.m. Defendant could not recall whether ASA Gonsalves ever entered the room. He never gave a statement to anyone that he shot the victim. Defendant denied having told O'Connor that he shot the victim and that he wanted to die.

On cross-examination, defendant stated that Jackson, Jr., his cousin, is Latiker's friend. The detectives did not say much to him; most of the time they sat in silence. He made no statements and denied that anyone ever read his rights to him on the day of his arrest.

On rebuttal, the State called Detective Lowery to impeach Gloria and defendant. Defense counsel objected to the impeachment, and the court ruled that the detective could testify as to whether he had a conversation with Gloria but he could not discuss its substance. Lowery testified that he spoke to Gloria on October 15, 1992, at her home and later that day at the police station. He never informed her they were looking for defendant in relation to a burglary investigation. At Corliss High School, neither Lowery nor Detective O'Connor was silent. When they informed him of the nature of their investiga-

tion, defendant "reared up in the chair" and then "he pushed himself against the wall, like he was in shock."

According to Detective Lowery, Jackson, Sr., telephoned the police and stated he was bringing in his son. The Jacksons arrived at the police station at 11:30 a.m. Later that day, Jackson, Sr., again telephoned and told the police he had some information on the investigation. Jackson, Sr., arrived at 4 p.m. with Latiker. At 5:30 p.m., Lowery and Detective O'Connor read defendant his *Miranda* rights and spoke with him in the presence of his uncle, Jackson, Sr. During their conversation, defendant acknowledged that he had shot the victim. Lowery testified that defendant later told the entire story to him, ASA Gonsalves, Detective O'Connor, Jackson, Sr., and Dwanda.

ASA Gonsalves testified on rebuttal he did not tell Jackson, Sr., he was there to represent defendant on a burglary charge, but that he was an assistant State's Attorney. Gonsalves stated that Dwanda and Jackson, Sr., were allowed to be in the interview room with defendant when he gave his statement in order to provide him with support.

The jury found defendant guilty of first-degree murder. He was sentenced to 40 years in prison. This appeal follows.

I

Defendant first contends the circuit court improperly denied his motion to quash the arrest in the absence of probable cause.

■ Probable cause to arrest exists where the totality of the circumstances known to the police officers at the time of arrest is sufficient to warrant a reasonably prudent person to believe that the suspect has committed a crime. *People v. Hendricks*, 253 Ill. App. 3d 79, 88, 625 N.E.2d 304 (1993). A police officer's knowledge of probable cause may be based on an informant's tip and, if the facts supplied in such a tip are essential to a finding of probable cause, the tip must be reliable. *People v. Weston*, 271 Ill. App. 3d 604, 611, 648 N.E.2d 1068 (1995). One indicium of reliability of information exists when the facts learned through police investigation independently verify a substantial part of the informant's tip. *People v. James*, 118 Ill. 2d 214, 225, 514 N.E.2d 998 (1987). The reliability of the informant is another factor to be considered. *People v. Adams*, 131 Ill. 2d 387, 397, 546 N.E.2d 561 (1989). A circuit court's finding of probable cause is reviewed *de novo*. *Ornelas v. United States*, 517 U.S. 690, 698, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1662-63 (1996).

■ Defendant contends his arrest violated the fourth amendment (U.S. Const., amend. IV) because the police officers acted solely upon

the uncorroborated statements of a confidential informant and, further, he was improperly precluded from inquiring into the reliability of the informant, relying upon *People v. Adams*, 131 Ill. 2d 387, 546 N.E.2d 561 (1989) (*Adams*), and *People v. Thomas*, 47 Ill. App. 3d 402, 362 N.E.2d 7 (1977) (*Thomas*).

In *Adams*, no probable cause existed to arrest defendant where the police officers received information that was not wholly corroborated from a first-time paid informant. *Adams*, 131 Ill. 2d at 400. The information in *Adams* specified only that defendant had departed for Kentucky and would return with cocaine after meeting a certain individual. 131 Ill. 2d at 392. In *Thomas*, a burglar left shoeprints with the name "Florsheim" at the crime scene. *Thomas*, 47 Ill. App. 3d at 404. The police in *Thomas* did not have probable cause to arrest defendant at a tavern a few hours after the burglary, having failed to compare defendant's shoes with the shoeprints found at the crime scene. 47 Ill. App. 3d at 405.

In the case *sub judice*, a confidential informant (defendant's uncle) told police that he overheard a conversation between defendant and Jackson, Jr., in which the two discussed how defendant had shot the victim in the bank parking lot. He heard the two address their concern about the weapon used in the shooting because it had been recovered by the police recently. The informant reported that defendant lived at 121st and Michigan, and Jackson, Jr., lived near 91st and Yates Streets. The informant also supplied the detectives with the approximate ages of the two boys.

The detectives corroborated this information first, by ascertaining that Jackson, Jr., in fact had been arrested for the unlawful use of a weapon and, second, by determining that the weapon was in police custody. Lab results showed a strong probability that the weapon recovered from Jackson, Jr., was used in the February 28, 1992, shooting of Woody Woods and that the gun had the same characteristics as the bullet removed from the victim. Only two weapons manufacturers in the United States make handguns with the same characteristics as the weapon at issue here. Detective Lowery confirmed that the addresses given by the informant were proper. Lowery's own information indicated that the perpetrators could be two or three African-American males who were in their teens or early twenties. Lowery learned that defendant was an African-American male in his teens and Jackson, Jr., was an African-American male in his early twenties. Finally, Lowery's investigation revealed that both defendant and Jackson, Jr., had given the same home address on a previous arrest. The detectives corroborated not only all the informant's statements, but their own information from

other witnesses. It was revealed at trial that the informant was one of defendant's uncles, Charles Jackson.

Although defendant asserts the circuit court erroneously barred him from determining the credibility of the confidential informant, the reliability of the informant is only one factor to be considered under a totality of the circumstances. See *People v. Adams*, 131 Ill. 2d 387, 397-98, 546 N.E.2d 561 (1989). Defendant also submits that the police performed a ballistics test on the weapon taken from Jackson, Jr., after the arrest and discovered that the weapon was not used in the shooting of February 28, 1992. The record, however, does not reveal that any such test was performed. Indeed, defendant's motion *in limine*, to exclude the introduction of the gun because no ballistics test had been performed, was never sustained or denied.

Given the detectives' independent investigation and corroboration of the informant's statements, it must be concluded that the circuit court's finding of probable cause was proper.

## II

Defendant next asserts he was deprived of his right to a fair trial because the State improperly introduced inadmissible hearsay regarding (1) the informant's conversation with police, and (2) the detectives' conversations with Latiker and Jackson, Jr.

## A

Defendant argues he was denied his right to a fair trial because the State introduced inadmissible hearsay. The State counters that defendant has waived this issue by not objecting at trial.

In order to preserve an issue for review, an objection must be made at trial and in a post-trial motion. *People v. Turner*, 128 Ill. 2d 540, 555, 539 N.E.2d 1196 (1989). Defendant failed to object at trial or in his post-trial motion to the alleged improper statements and, therefore, has waived the issue on appeal.

■ Absent waiver, the statements were not inadmissible hearsay because the detective was merely recounting the steps of his investigation. An out-of-court statement is deemed hearsay when offered to prove the truth of the matter asserted; if the statement is offered for any other purpose, it is not hearsay. *People v. Simms*, 143 Ill. 2d 154, 173, 572 N.E.2d 947 (1991). A police officer may recount the steps taken in the investigation of a crime, and may describe the events leading up to arrest, where such testimony is necessary and important to explain fully the State's case to the trier of fact. *People v. Hayes*, 139 Ill. 2d 89, 130, 564 N.E.2d 803 (1990). A police officer may testify about his conversations with others when such testimony is not offered to prove the truth of the matters asserted by others,

but is used to show the investigative steps taken by the officer, even where the testimony suggests that a nontestifying witness implicated defendant. *Simms*, 143 Ill. 2d at 174.

■ Defendant contends the detectives' statements concerning his conversation with the confidential informant prejudiced him because the testimony was offered to prove the truth of the matter asserted; namely, that defendant committed the crime. Defendant, however, has failed to identify any out-of-court statements offered by the State.

Defendant nevertheless argues that Detective O'Connor testified about a conversation with the confidential informant leading to his arrest. The detective did not testify about the substance of his conversation with the informant, however; the State did not offer any out-of-court statements to prove the truth of the matter asserted. The record demonstrates that the State deliberately asked the detective to conceal the substance of the informant's statements. The cases cited by defendant are distinguishable because, in those cases, the State admitted incriminating out-of-court statements under the pretense of demonstrating what the police officers learned in the course of their investigations. See *People v. Shum*, 117 Ill. 2d 317, 341-42, 512 N.E.2d 1183 (1987); *People v. Furby*, 228 Ill. App. 3d 1, 10-11, 591 N.E.2d 533 (1992).

Defendant also relies upon a recent case, *People v. Rivera*, 277 Ill. App. 3d 811, 661 N.E.2d 429 (1996), to support his contention. In *Rivera*, a police officer testified that after arresting defendant and two others, he drove to the scene of the shooting and spoke with some witnesses who stated, "yeh, that's them." 277 Ill. App. 3d at 817. Although defendant's objection to the testimony was sustained, the State continued to delve into the subject and later stressed the event in closing argument. 277 Ill. App. 3d at 817-18. Unlike *Rivera*, the detective in the present case did not relate hearsay identification testimony which went to the essence of the dispute. The State, aware of the prejudice of a hearsay identification, specifically asked Detective O'Connor not to repeat the substance of his conversation with the informant. *Rivera* is inapplicable to the case *sub judice*.

Although defendant contends the detective's testimony created the impression that the family member was in fear of his life and was privy to a confession by defendant, the record reveals that police did not arrest defendant until three days after receiving the information from the family member. After defense counsel questioned the circumstances surrounding defendant's arrest, the State was justified in resolving that issue by having Detective O'Connor testify as to the events leading up to defendant's arrest.

The State did not offer into evidence inadmissible hearsay

concerning a conversation with the informant and there was no error in this regard.

## B

■ Defendant maintains the State improperly introduced evidence that after Latiker and Jackson, Jr., were advised of their *Miranda* rights and talked with the police, the police had a conversation with defendant in which he confessed. Defendant claims the inference to be drawn from this evidence is that Latiker and Jackson, Jr., made statements implicating defendant which led the police to interview him in the police station. Defendant asserts this inference is undeniable because the police testified that the existence of discrepancies between defendant's statement and what Latiker and Jackson, Jr., said required them to reinterview the witnesses and return to defendant, who then made a full confession. Again, defendant has failed to identify any out-of-court statements allegedly made.

On rebuttal, Detective Lowery testified, in part, as follows:

"[ASSISTANT STATE'S ATTORNEY:] Q. And tell us what you said to defendant, and tell us what he said to you?

A. I explained to him that two people had been interviewed, one Bobbie Latiker and one Fred Jackson, Junior, and they gave us information—

DEFENSE COUNSEL: Objection, Judge.

THE COURT: What is your objection?

DEFENSE COUNSEL: Hearsay.

THE COURT: Well, it is hearsay, but it comes in under the hearsay exception. Now, without relating what the substance of the conversations were with other persons, and statements, if any by the defendant.

\* \* \*

Q. Again, Detective Lowery, without telling us what you said that other people were saying to defendant, tell us what the defendant's response was after you told him what the others were saying?

A. He said I'm sorry I killed that man, I want to die, kill me, shoot me, and then he broke down and just started crying \* \* \*."

Defendant insists the State created the impression Latiker and Jackson, Jr., corroborated the detectives' testimony concerning his confession and there is no conceivable reason why the State would introduce evidence of police conversations with Latiker and Jackson, Jr., after advising them of their *Miranda* rights, unless it was to show that these two unavailable witnesses implicated him.

None of the State's witnesses testified, however, as to the substance of conversations with Latiker and Jackson, Jr. Defendant

testified that he never confessed to the crime, he was not in a room with Jackson, Sr., and his sister, Dwanda, he could not recall meeting the assistant state's attorney and he was never read his rights. The testimony at issue merely differently recounts what occurred during the course of the investigation and the circumstances surrounding defendant's two confessions. There was no error.

■ Defendant submits that he was prejudiced also because the State in closing argument asserted that Latiker and Jackson, Jr., were hiding in order to protect defendant. The challenged statement, in part, is as follows:

"He [defendant] got away for a long time. This happened in February. And for months the defendant lived in fear. You can imagine for months he lived in fear, because three people knew what he had done. Freddie Jackson, Jr. knew, Bobbie Latiker knew, and the person who sits before you knew, and it is hard to keep a secret.

\* \* \*

They got hold of Jackson, Jr., and they then went and talked to the defendant again, and by now the defendant was feeling sorry.

\* \* \*

Assistant State's Attorney Gonsalves never had the chance to get a handwritten statement, and he told you. He went to that police station, and he talked to Bobbie Latiker. He talked to Freddie Jackson, Jr., and he knew, ladies and gentlemen, exactly what was going on.

DEFENSE COUNSEL: Objection.

\* \* \*

Once again, stating facts not in evidence, Judge. It is not in evidence at this point.

THE COURT: Objection overruled. It is commenting on the evidence. It is argument, inferences and comments to be made on the evidence. Go ahead."

Defendant contends these statements improperly emphasized the hearsay testimony of Latiker and Jackson, Jr. in closing argument. The record reveals, however, that no witness testified as to the substance of the conversations and the State did not provide any out-of-court statements of Latiker or Jackson, Jr.

The State's arguments were proper comments on the evidence and defendant was neither impermissibly prejudiced by, nor convicted upon, inadmissible hearsay.

## III

■ Defendant urges he was denied his right to a fair trial when the State introduced an inculpatory statement he made to his Aunt

Gloria without providing notice during discovery that the statement would be used. The State counters that defendant has waived this issue on appeal.

The record reveals that defendant failed to raise the issue in his post-trial motion and, therefore, has waived the issue on appeal. *People v. Turner*, 128 Ill. 2d 540, 555, 539 N.E.2d 1196 (1989).

Notwithstanding waiver, there was no error. Defendant's contention is that on cross-examination of Gloria, the State asked her whether defendant had made certain inculpatory statements to her regarding the shooting. Although defendant asserts that the State did not provide an answer to discovery, defendant concedes that Gloria's statement was included in the police report furnished to defendant's trial counsel. Further, defense counsel conceded at trial that he had received the State's supplemental answers to discovery.

Given that Gloria's statement was included in a police report which defendant's trial counsel had received, defendant was not denied his right to a fair trial.

## IV

■ Defendant submits he was denied his right to a fair trial when the State did not perfect impeachment on noncollateral matters. The State asserts defendant has waived this issue by failing to object in his post-trial motion and that it did not need to perfect impeachment on a collateral matter.

The record reveals that defendant failed to raise the issue in his post-trial motion and, therefore, has waived the issue. *People . v. Turner*, 128 Ill. 2d 540, 555, 539 N.E.2d 1196 (1989).

Aside from waiver, there was no error. Defendant argues that the State cross-examined him concerning the type of vehicle Latiker drove and failed to perfect an attempted impeachment.

The prosecution must not make unsupported insinuations of misconduct on cross-examination without producing supporting evidence in response to denials of misconduct. *People v. Nuccio*, 43 Ill. 2d 375, 381, 253 N.E.2d 353 (1969). Where the guilt of an accused is not manifest, but is dependent upon the degree of credibility accorded by the trier of fact to his testimony, and there are substantial numbers of unperfected insinuations which, if considered, could seriously impeach the credibility of defendant and his witnesses, justice dictates that defendant be given a new trial. The question is one of degree. See *Nuccio*, 43 Ill. 2d at 396.

The cases cited by defendant are distinguishable because each involves substantial numbers of unsupported insinuations of misconduct by the accused. See *Nuccio*, 43 Ill. 2d at 396; *People v.*

234

*Robertson*, 198 Ill. App. 3d 98, 107-08, 555 N.E.2d 778 (1990). In the present case, the State's questioning did not insinuate misconduct by defendant, but suggested that Latiker's mother owned a Bronco-type vehicle. Two of the State's witnesses testified that they saw a Bronco-type vehicle parked near the curb at the Heritage Pullman Bank on the night of the shooting. Defendant's denial of the existence of the vehicle simply contradicted the testimony of the State's witnesses on a collateral matter. Defendant was not deprived of his right to a fair trial.

V

■ Defendant lastly assigns error to State's evidence of his reaction upon being told of the nature of the investigation, claiming this testimony was inadmissible because it violated his right to remain silent. The State argues defendant has waived the issue and, absent waiver, defendant's reaction was an admission properly received into evidence.

The record reveals that defendant neither objected at trial nor raised it in his post-trial motion and, therefore, has waived this issue on appeal. *People v. Turner*, 128 Ill. 2d 540, 555, 539 N.E.2d 1196 (1989). Absent waiver, we consider on its merits defendant's assertion that the detectives' testimony concerning his reaction violated *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), and we disagree.

Prosecutorial questions and remarks concerning a defendant's post-arrest silence generally are improper (*People v. Pegram*, 124 Ill. 2d 166, 176, 529 N.E.2d 506 (1988)), but *Doyle* does not require a formalistic understanding of silence (*Anderson v. Charles*, 447 U.S. 404, 409, 65 L. Ed. 2d 222, 227, 100 S. Ct. 2180, 2182 (1980)). "An admission is any statement or conduct by a defendant which, when considered with other facts in evidence, permits an inference of guilt of the offense charged." *People v. Burns*, 99 Ill. App. 3d 42, 45, 424 N.E.2d 1298 (1981). An admission always may be received as substantive evidence for the purpose of showing guilt. *Burns*, 99 Ill. App. 3d at 45. "[N]onverbal conduct not intended as an assertion should not be classified as hearsay." *People v. Jackson*, 203 Ill. App. 3d 1, 13, 560 N.E.2d 1019 (1990).

Detective O'Connor testified that after he informed defendant of the nature of police investigation, defendant "hit his head against the chair and grimaced." Detective Lowery testified that defendant "pushed himself against the wall, like he was in shock or something when I was explaining to him the nature of the investigation." O'Connor also stated that defendant did not say anything at the time.

Although defendant contends that the State improperly used his silence against him, the State actually used defendant's conduct as an admission. See *People v. Foster*, 199 Ill. App. 3d 372, 378-82, 556 N.E.2d 1289 (1990) (holding admissible a police officer's testimony regarding defendant's behavior during questioning where the officer did not testify as to what he believed the behavior meant). A *Doyle* violation occurs when the State uses defendant's post-arrest silence to impeach his exculpatory testimony. See *People v. Herrett*, 137 Ill. 2d 195, 213, 561 N.E.2d 1 (1990). *Doyle*, however, "does not apply to impeachment of the criminal defendant by means of assertive statements made subsequent to the giving of *Miranda* warnings manifestly inconsistent with the accused's testimony at trial." M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 613.5, at 518 (6th ed. 1994). The case *sub judice* does not involve a *Doyle* violation because the State did not impeach defendant with his silence following arrest, but offered defendant's nonverbal reaction to the detectives' statements. Defendant's reaction was conduct, not silence, from which guilt could be inferred; it was received properly as an admission. Defendant never invoked his right to remain silent and the detectives did not testify as to what they thought defendant's reaction communicated.

The State did not use defendant's silence against him but submitted testimony concerning an admission by conduct; defendant was not denied his right to a fair trial.

The foregoing discussion reveals no bases upon which to disturb the jury's finding of defendant's guilt. Accordingly, defendant's conviction must be affirmed.

Affirmed.

SCARIANO and DiVITO, JJ., concur.